Argued February 20; affirmed June 11; rehearing denied
July 16, 1935

IN RE KELLY'S ESTATE
ROEHR ET AL. *v.* KELLY ET AL.

(46 P. (2d) 84)

*O. C. Roehr,* of Portland (Pendergrass, Roehr & Zollinger and H. L. Barzee, all of Portland, on the brief), for appellant.

*T. M. Kerrigan,* of Portland, for respondents.

ROSSMAN, J. October 11, 1933, the document with which we are now concerned was signed by Plympton J. Kelly. October 18, 1933, he died, aged 70 years. The contestants aver that "prior to the 18th day of October, 1933, the said P. J. Kelly was suffering greatly from physical weakness and pain and that the will as made and executed by P. J. Kelly was not the free and voluntary act of the said P. J. Kelly, but was as a result of coercion, duress, undue influence and fraud on the part of Jessie G. Northrop, who, at the said time, was acting in a confidential capacity toward the said deceased P. J. Kelly, to wit, as nurse and patient".

The alleged will bequeathed to Jessie G. Northrop Kelly's home place (a six-acre tract in the city of Portland) and another tract of 1.85 acres, and then made her residuary legatee. The appraised value of the estate is $90,055.87. Mrs. Northrop's bequest is worth about $45,000. The other beneficiaries of the will are L. J. Kelly, a brother of the deceased, aged 65 years, whose bequest is worth approximately $10,000; L. B. Kelly, another brother, aged 68 years, whose bequest is worth about $8,000; and Elmer McClure, a nephew of Kelly's deceased wife, whose bequest is worth $28,000.

Kelly's wife had predeceased him about five years, and his two sons had died prior to the death of Mrs. Kelly. His heirs were the aforementioned two brothers, L. J. and L. B. Kelly, Gertrude Hunter, a grandniece, and Lloyd Woodside, a nephew. These four persons, together with Elmer McClure, are the contestants.

We shall now state what we deem to be the controlling facts, realizing as we proceed that many of the facts which we are about to mention are disputed.

P. J. Kelly was an intelligent man who was firm in his convictions and who made many loyal friends. He

impressed those who knew him as a fair and just man. He refrained from the use of intoxicating liquor and attended a Presbyterian church regularly. The record does not disclose the business in which he had been engaged, but apparently the estate which he possessed at the time of his death was the result of his own efforts. At the time with which we are concerned he resided at his home place consisting of about six acres which contained a fruit orchard. Kelly's brother, L. J. Kelly, whom the witnesses called Jack, took care of this property and sold the fruit grown thereon. For his services Kelly paid him $30 a month and provided him with board and room in Kelly's home.

In the fall of 1930 Kelly became afflicted with a heart ailment, and at that time his physician sent to his home as a nurse the aforementioned Jessie G. Northrop, whom Kelly had not previously known. She was not related to him. Mrs. Northrop at that time was, and still is, the wife of H. D. Northrop. At the time of the trial (1934) she gave her age as 37 years. According to Mrs. Northrop at some time in 1931 she and Northrop became estranged. The evidence indicates that the estrangement was due to her relationship with Kelly. Kelly's aforementioned illness confined him to his bed for four weeks. At the conclusion of that period he had fully recovered; nevertheless, Mrs. Northrop stayed in the Kelly home two weeks longer. Kelly had become fond of her company. At that time Kelly's brother Jack was staying at Kelly's home, and another occupant of the home was a Miss Minnie Cargill, who did the cooking and housework. Something in the attitude of Mrs. Northrop toward Kelly can be gleaned from the fact that after she had been in the home only one day she declared to Kelly's aunt: ''You know, I feel per-

fectly at home here; it seems to me as if I just belonged here; I think I will set my cap for your nephew." As a further possible indication of Mrs. Northrop's attitude toward Kelly at that time is the incident which we shall now mention. About this time she and a friend, a Mrs. Ruth Anderson, had a discussion which Mrs. Northrop related thus: "We were discussing, talking about Mr. P. J. Kelly's home and how much nicer it was, how cheery it was with the new curtains and things, and Mrs. Anderson hoped that—she said he ought to remember me when he died, and I told her the story of an elderly old lady that lived in southern California my aunt had told me about,— that a young lady had taken an interest in her expecting to see her—and when she passed on, she had remembered her, and Mrs. Anderson laughed and she said, 'Well, you remember what we got—how we were remembered from Mrs. Manning'." According to further parts of her testimony, the elderly California woman's will rewarded the kind friend with a valuable jewelry store. Mrs. Northrop added that she and Mrs. Anderson had shown the aforementioned Mrs. Manning attention for five years while she was in ill health, but had received nothing from her except "a lot of nice words with some question marks". According to Mrs. Anderson, Mrs. Northrop said, as a part of this conversation, "that Mr. Kelly had none (relatives) outside of brothers—had no relatives and that if she was nice to him he would probably be nice to her when he died". After Mrs. Northrop had left Kelly's home she made frequent visits there until October of 1931, and at other times Kelly called for her in his automobile at her places of employment. Kelly was aware of the fact that she had a husband and had met the latter on one or more occasions.

In October of 1931 Mrs. Northrop's elderly mother, who resided in Tillamook, became seriously ill; thereupon Kelly drove Mrs. Northrop in his car to Tillamook where she went to nurse her mother. From then on Mrs. Northrop remained in Tillamook until about three weeks prior to Kelly's death. In this period she came to Portland once each month on a Saturday night and remained at Kelly's home for the succeeding eight days. Upon the trip to the mother's Tillamook home the following incident took place, according to the testimony of Mrs. Northrop: "He told me that he wanted to ask me a question and before asking he was going to tell me that here, in the presence of the great boundless Pacific and the beautiful blue sky, he was going to promise to love and protect me as long as life lasted, and asked me if I would do the same, and I told him I would." December 11, 1931, the mother died and then, according to Mrs. Northrop, Kelly "asked me to have my father and my son come out to Portland, and that I might secure a divorce and become his wife and live there with him". She said she declined to do this because "Mr. Kelly had had enough sorrow without my bringing in my father to add to his trouble." The father was elderly and died September 23, 1933. The son was by a previous marriage. About the time Mrs. Northrop took up her home at Tillamook, Kelly began to send her $30 a month, and this continued until the month of Kelly's death. When Mrs. Northrop was at Tillamook she and Kelly exchanged letters daily, but none of these was produced at the trial. Mrs. Northrop claimed that she burned them a few days before Kelly's death. During the same period she wrote many letters to the aforementioned Ruth Anderson whom she regarded as "my own dear darling sister", and in whom she said she reposed unlimited confidence.

Mrs. Anderson at one time had been employed by Kelly and was regarded by him as a friend. These letters were produced by the contestants. In virtually every paragraph of every one of these letters, numerous in number, Mrs. Northrop made some reference to Kelly. Many of these statements avow affection for him in extravagant terms. For instance, one reference is: "He sure is an indispensable lover, pal, friend, sweetheart, daddy darling." Mrs. Northrop claims that these letters prove a strong affection upon her part for Mr. Kelly. A noticeable feature of them is the absence of any mention of qualities of intellect or of character possessed by Kelly that had aroused her respect and admiration. The letters contain virtually no mention of incidents wherein she had observed Kelly display integrity, fairness, intelligence, tenderness, kindness or any other virtue to account for her protestations of affection. Esteem, respect, and even reverence, may be manifested when a woman finds in an elderly man qualities which convince her that he is greatly superior to her in learning. But when the woman has not found in the man any such qualities, or at least makes no mention of them, one scarcely expects from her a constant outpouring of lovesick terms to a mutual friend, unless she anticipates that the friend will show the letters to him.

Without quoting from these letters or going into detail, we state that many of them indicate that the relationship between Kelly and Mrs. Northrop had become an intimate one. There is much other evidence in the record which also reveals the character of the relationship between the two. In short, it sustains the conclusions of the circuit court judge who presided over the trial that the relationship was "more than a pla-

tonic friendship''. It is our belief that the relationship was illicit and meretricious.

Shortly after Mrs. Northrop entered the Kelly household she assumed a position of authority. She told Jack that ''she was going to become mistress of the house''. She rearranged the furniture and purchased, at Kelly's expense, new curtains for the windows and new silverware for the table. She complained to him about Minnie Cargill and obtained from him authority to give orders to her. There was a rosebush in the yard which Mrs. Kelly had planted, and this circumstance had caused Kelly to manifest affection for the bush. Then there was also upon the place a Catalpa tree which Kelly's deceased son had brought as a seedling from the Oregon coast, and which had grown into a handsome tree. Kelly had admired and prized these possessions since the death of his wife and son. Mrs. Northrop manifested dislike of the rosebush and the tree and voiced her complaint for some time. Finally, Kelly consented to the removal of the rosebush; Mrs. Northrop herself uprooted it. Later, the tree was cut down. Thus, two living remembrances in Kelly's own dooryard of deceased members of his family were gone. When they went the influences that had tied him to the past lost part of their strength and it became easier for new influences to assert themselves upon him. The rearrangement of the furniture, the substitution in his household of new curtains and new silverware for the old had already had a tendency to turn Kelly away from the home of his family to the house as Mrs. Northrop conducted it. As a witness, she spoke of it as ''our home''.

Kelly had many friends who visited him at his home. Mrs. Northrop soon coined opprobrious nicknames for

several of these, by which she referred to them in Kelly's presence. Her nickname for Kelly's brother Jack was Jackass, and she referred to the 70-year-old aunt as "The Battle-axe". Finally, Kelly began to use some of these names himself. The aforementioned aunt testified that Mrs. Northrop's treatment of her was such that about two years before Kelly's death she declined to come to his house any more. A young man of whom Kelly had been very fond testified to an incident provoked by Mrs. Northrop whereby the friendly relationship between himself and Kelly was terminated. Another of Kelly's friends related an incident for which Mrs. Northrop was responsible whereby her visit to the home was made so embarrassing that she never came again.

When Mrs. Northrop's mother and father died Kelly provided steel vaults for each, and in each instance paid the funeral expenses. The total sum expended was $800. June 15, 1933, he gave to her a check for $1,000, which, however, she did not cash until October 7, 1933, eleven days before Kelly's death. According to her testimony, Kelly gave to her in April, 1932, "a safety deposit box" but she said that she did not see the box until October, 1933. She swore that each of them had a key to the box. When she opened the box she saw in it an envelope but did not examine its contents. She claimed, however, that Kelly had put bonds in the envelope and that these were a gift to her. Just after Kelly's death she took the bonds to her home in Tillamook. During the trial a memorandum, in Kelly's handwriting, was produced which indicates that the bonds were deemed worth $38,510.

In 1931 Kelly had a slight recurrence of his illness, but was not attended at that time by Mrs. Northrop.

In the latter part of September, 1933, his illness recurred, and, as we have seen, brought him to his death October 18, 1933. September 30, 1933, he telephoned to Mrs. Northrop, and upon that day she came to Portland. From then on she remained with Kelly until the time of his death. Kelly's physician thus described his ailment: "A complication of conditions, heart, kidney and vascular trouble, cardio-renal trouble." His last illness confined him to his bed continuously. Mrs. L. B. Kelly testified that about the middle of October, 1933, Kelly declared to her one morning: "I will tell you, about half of the time I don't know what I am doing or where I am at." Mrs. Anderson, who visited Kelly at about the same time, gave similar testimony. The testimony of other witnesses, however, including the attending physician, indicates that during his last illness Kelly had command of his faculties, with the exception of two occasions. His sight and hearing were good, and until the end he did not give the impression of being an old man. Nevertheless, he was a very sick man.

During his last illness, many of Kelly's relatives and friends called at his home and asked permission to visit him. To some of these Mrs. Northrop sent word that they could not enter, explaining that Kelly's condition would not permit him to have visitors at that time. His physician swore that he had never instructed the nurse to deny admission to visitors. Except upon three or four occasions Mrs. Northrop remained in the room when the visitor or relative called, and in some instances requested them to leave after they had been in the room for only a few minutes. When Lou Kelly and his wife came from their home in eastern Oregon, realizing that P. J. Kelly was in his last illness, Mrs. Lou Kelly offered to assist Mrs. Northrop with her duties, but her offer was curtly refused.

October 17, being the day before Kelly's death, Mrs. Northrop, in an unfriendly manner, directed Mr. and Mrs. L. B. Kelly and Jack to come to P. J. Kelly's bedside. Mr. and Mrs. Kelly and Jack, a few minutes previously, had asked the attending physician whether the employment of an additional nurse would be beneficial. When they had entered Kelly's room Mrs. Northrop accused Jack, in an angry tone, of selling a box of apples without accounting for the proceeds, and also accused him of endeavoring to bring about her discharge. Pointing an accusing finger at Jack, she said, ''Now you come through, and you come through straight.'' The tense situation that developed was relieved when Jack left the room. Mrs. Lou Kelly followed him. P. J. Kelly, Mrs. Northrop and Lou Kelly remained. What next ensued was thus related by Lou: ''He (P. J. Kelly) said he could just as well have excluded Jack from his will, cut him clear off, and she (Mrs. Northrop) said, 'Well, phone over and have the lawyer come over and write it up.' Well, I talked with him a little while, a very short time then, and he said if he was able to he would kick Jack clear out, clear up to Oregon City.'' Jack testified that after he had left the room he decided to make his home thereafter with his daughter. About the same time Lou and his wife took their belongings and moved to a friend's home. In the meantime, Mrs. Northrop telephoned a request to the attorney mentioned in the above quotation to come to Mr. Kelly's home. Later in the afternoon when the attorney was in P. J. Kelly's room, together with Mrs. Northrop and a friend, Jack called at the bedside and asked P. J. Kelly if he really wanted him to leave. Thereupon, Mrs. Northrop again preferred her charges, but the matter was quieted down through the kindly offices of the attorney. Shortly after that Kelly

lapsed into the unconscious condition which preceded his death by several hours.

The apples just mentioned were worth only a few cents. Jack's handling of the apple crop had never before caused either of the brothers to utter an unfriendly word concerning the other. Prior to the incident mentioned in the preceding paragraph the relationship between Jack and P. J. Kelly had been uniformly friendly and cordial, according to the testimony of all except Mrs. Northrop. Lou Kelly lived in eastern Oregon, but upon his trips to Portland about once a year he visited his brother. He testified that they had had no misunderstanding since their boyhood quarrels. The two, however, did not exchange letters. Another of Kelly's heirs, the aforementioned Gertrude Hunter, lived at Echo in eastern Oregon, and visited Kelly occasionally. The relationship between Kelly and the remaining heir, Lloyd Woodside, is not disclosed.

Kelly, apparently, did not repose much confidence in Jack's ability to hang on to his property, and at one time, while contemplating the disposition of his property, inquired how he could provide an annuity for Jack. He always said that he would like Jack to be well taken care of. To some P. J. Kelly expressed an intention of disposing of his property prior to death by deeds so as to avoid litigation over a will. To others he spoke favorably of the laws of descent, stating that they would distribute his property in harmony with his plans, and that he had no intention of making a will. Kelly had a cousin, Nan Crary, who lived 200 miles from Portland, and who owned property near Kelly's. She, having confidence in Kelly's business ability, sought his advice concerning her property whenever she came to Portland. August 13, 1933, she had an extended conversation with Kelly in the course of

which he referred to Mrs. Northrop. According to this witness, Kelly said that "his lady friend (Mrs. Northrop) didn't want him—she wanted the property, she would like him to give her the property but—well, either deed or will her the property, and he said that he wasn't going to do it; he was going to sell it". According to this witness, Kelly stated at that time, "She (Mrs. Northrop) had been pestering him about a year and a half for a will. * * * Well, he said he was—he said he wasn't going to make a will; * * *. I said, 'Well, I don't see any reason, if you don't want to make a will, I don't see any reason why you should', and he said that there wouldn't be any harm done if he didn't make a will, that the property would go to the relatives anyhow; there wouldn't be any harm done. He didn't mention giving, in his will, giving anybody else anything, and it was just as—the first time when he spoke about Mrs.—about his lady friend, wanting him to either deed or will her the home place, he didn't specify anything at that time; he has often told me that he was going to give a man by the name of McClure his wife's property." McClure was the nephew of Kelly's deceased wife, and it is clear that Kelly felt in honor bound to have the property which he had inherited from his wife descend to her relatives. The bequest to McClure is in harmony with that purpose. Kelly never expressed to any one, unless it be Mrs. Northrop, an intention of giving her anything.

Mrs. Anderson testified that when Mrs. Northrop related to her, in 1931, the incident of the California woman rewarding a kind friend in her will, she expressed a desire to obtain recognition from Kelly, and "told me that if I would help her put this over with Mr. Kelly that she would see that I never wanted for anything". After Kelly had had another heart attack

and Mrs. Northrop feared that death would soon overtake him, she wrote a letter to Mrs. Anderson, dated December 8, 1931, stating: "Ruth, here is where you can protect and use *your brain*. P. J. has not a will or a darned thing, saying if he thinks he is going he will attend to protecting me. If he waits till then, his kin can say I *influenced* him, and I have not. Oh, sister dear, I am so unstrung, so heartbroken, over all this. * * * Ask him if my letters to him are safe. Be hell if some of his kin got hold of them." (The words in italics are underscored in the letter.) Mrs. Anderson testified that in the spring of 1932 Mrs. Northrop "said that Mr. Kelly hadn't made a will and hadn't protected her in any way, and that she needed protection. She was playing a fast game, and she needed some protection". Mrs. Anderson did not endeavor to comply with these three requests of Mrs. Northrop. The latter explained her letter of December 8, 1931, by saying that in November, 1931, "Mr. Kelly told me that the house, the home and the acreage, the house over on Steele, was to be mine, and the five acres was to be Jack's, and Ruth had written me and told me how badly Mr. Kelly was." Concerning the third incident, she said that it occurred when Kelly's car, in which she was riding as his guest, collided with another car. She said she feared that publicity would result which would come to the attention of her husband and that he would then learn that she had been riding with Kelly. This explanation does not find favor with us because Mr. Northrop was well aware of the fact that his wife and Kelly were much in each other's company.

We come now to the relationship existing between Mrs. Northrop and her husband. He was apparently considerably older than she, was a war veteran and

during much of the time with which we are concerned was confined in Veterans' hospitals undergoing treatment for tuberculosis. They were married October 5, 1926. According to Northrop's testimony, in April or May, 1931, he was willing that his wife obtain a divorce, and explained this by stating: "When my wife returned from nursing Mr. Kelly the first time, Mr. Kelly had grown so that he liked her. * * * He told me that he thought a great deal of Mrs. Northrop. * * * Of course, I wanted to know Mr. Kelly a little more before I would accept it (divorce); I wanted to be satisfied of his intentions and his purpose. I eventually found out that his intentions were upright and honorable, so I had offered at that time, when there was this difference, I said, 'If there is such a great liking'—that is the question you asked me— I said, 'If it is necessary for me to get out of your way, I will grant you a divorce.' But she said it wasn't necessary, that there was no call for such drastic measures. Mr. Kelly liked her and treated her like a father." In another portion of his testimony, Northrop testified: "He treated her as a father, and very kindly, and he also liked me." Mrs. Northrop testified, in the language which we shall now quote, that Northrop never consented that she have a divorce:

"Q. Did you hear his testimony on the witness stand in which he said that at the time you went to nurse Mr. Kelly, he told you that you could have a divorce if you wanted it? A. Yes, I did.

"Q. Was it true or untrue? A. It was untrue.

"Q. Did you ever at any time, or how many times, —I believe you already testified you discussed the matter of a divorce with him. How many times did you discuss it with your husband? A. Two or three times.

"Q. And he never consented to allow you a divorce? A. Never.

"Q. What did he say? A. He told me to call Mr. Kelly over to the house that he would fill him full of holes.

"Q. Did he say that all three times? A. Well, he told me each time that he would kill Mr. Kelly."

Mrs. Anderson swore that at some time in 1933 Northrop told her, "He said his wife had asked—had propositioned him that if she divorced him and married Mr. Kelly, if after Mr. Kelly's death, if she could marry him again, and Mr. Northrop answered, and I said to him, 'Well, Harry, what did you say?' and he said, 'It is unprintable.'" Concerning the incident mentioned by Mrs. Anderson, Mrs. Northrop testified:

"I asked him if I got a divorce and Mr. Kelly passed away if he would marry me again.

"Q. And what did he say? A. He said he certainly would not; if I ever left him, he was through with me forever."

She claimed that she and her husband quarreled many times about Kelly's attentions to her and that, when she told her husband that she loved Kelly more than she did him, "he went to work and got his rifle and loaded it and started out". She swore that four months after this incident (September, 1931) she and Northrop separated. She claimed that Kelly was aware of the estrangement. Mrs. Northrop conceded that she never spoke to an attorney about a divorce until October, 1933. At that time Kelly was upon his deathbed, and was consulting with an attorney about the disposition of his estate. When the attorney was at Kelly's house for that purpose, Mrs. Northrop spoke to him briefly upon the subject of a divorce for herself. Mrs. Northrop admitted that she never told Kelly that she could obtain a divorce. To the contrary, she told him that she could not.

A few months prior to Kelly's death a plan was under consideration to institute an action against him for the alienation of Mrs. Northrop's affections. An attorney was consulted and some conferences were had with Mr. Northrop. He, however, indignantly denied that he had instigated this plan. About the time that the alienation of affections action was under contemplation a property settlement was effected between Northrop and his wife. Mrs. Northrop made no explanation whatever of the contemplated alienation of affections action, although her friend, Mrs. Anderson, was one of the persons who had concerned themselves with it.

We come now to the preparation of the will. About a week or ten days before it was signed the attorney who later prepared it made a friendly call upon Kelly. He had never before performed professional services for Kelly, but was a young man of good standing whom Kelly had known favorably since the attorney's boyhood. As the attorney was leaving, Kelly stated that in a few days he would like to talk to him about "my business affairs". Two or three days later Mrs. Northrop telephoned to the attorney, stating that Kelly desired to see him. Upon this visit Kelly mentioned his heirs and inquired about the possibility of disposing of his estate through deeds so as to avoid litigation similar to that which he said had occurred over a will left by his sister. Upon this occasion the attorney gave advice and, at Kelly's request, prepared a deed by which Kelly conveyed a city lot as a gift to a young friend. As the attorney left the house Mrs. Northrop made her inquiry about her divorce. On the morning of October 11, Mrs. Northrop telephoned to the attorney, requesting that he come again, this time as promptly as possible. Kelly had been very ill during

the preceding night. The attorney arrived at the Kelly home at 10:30 a. m., had a conference with Kelly, received instructions from him to prepare a will, and retired to a downstairs room where he wrote the will. Early in the afternoon Kelly signed it. According to Minnie Cargill, Kelly's housekeeper, Mrs. Northrop said to her the morning the attorney was summoned: "Mr. Kelly, he hasn't any will, and I am going to get—tell him that he should get Mr. ———." The attorney she mentioned was the one who was summoned. According to the same witness, after the attorney had arrived she heard Mrs. Northrop say to Kelly: "Daddy, you won't go and not leave your baby anything? If you do, I'll cry." According to Miss Cargill, after the will had been signed Mrs. Northrop "came and told me that Mr. Kelly gave her the home and she would take care of me". We now turn to Mrs. Northrop's version of this incident. She testified: "She (Minnie) was crying and asked me if I got the home and I told her yes, and she cried and threw her arms around me and kissed me and she said, 'I am so glad because if Jack would have got it he would have kicked me out and I told her not to worry, that so long as she and I could get along, if I had the place, she would always have a home." According to Mrs. Northrop she left Kelly's room after the attorney had arrived, but concedes that she returned to it a few times while the attorney was conferring with Kelly. On one occasion, upon request, she brought to Kelly some mortgage papers. On another occasion she returned to the room and, after a few minutes' search, found Kelly's pen for him. While the attorney was downstairs drafting the will she brought Kelly his lunch, remaining in the room for approximately an hour. During the times she was absent from the room she remained across

the hall from Kelly's room or was downstairs. According to her testimony, after the attorney left, "I ran upstairs" to Kelly's room and "he handed me the will and told me to read it". After reading it, "I was overjoyed, and thanked him for it and kissed him for it."

On the afternoon of October 18 Kelly died. According to the testimony of all those who were present, including Mrs. Northrop, the latter, immediately following the death, changed her clothes quickly, filled her suitcases, removed the pillow slip from the pillow upon which the deceased's head was resting, and then left. She was gone within a half-hour after death occurred. It then developed that the things which she had packed into her suitcases were all of the documents and papers which Kelly kept at his home. She took these to a hotel. As a witness, Mrs. Northrop stated that Kelly had told her to deliver these papers to the attorney after his death. She testified that the pillow slip was the workmanship of her mother.

■ Let us now consider the principles of law applicable to the above facts. In *In re Estate of Riggs*, 120 Or. 38 (241 P. 70, 250 P. 753), the term "undue influence" is defined thus:

"Undue influence is not ordinary influence. It must be such as to overcome the free volition or conscious judgment of the testator and to substitute the wicked purposes of another. Suggestion or advice by a friend or relative, or one in confidential relation, is not undue influence, if it leaves the mind free to act on its own judgment."

From *Holman's Will*, 42 Or. 345 (70 P. 908), we quote:

"The fraud, force or undue influence that will suffice to set aside a will must be such as to overcome the

free volition or conscious judgment of the testator, and to substitute the wicked purposes of another instead, and must be the efficient cause, without which the obnoxious disposition would not have been made. This may be accomplished not alone by physical coercion or threats of personal harm or abuse, but also by the insidious operation of a stronger mind upon one weakened and impaired by disease or otherwise, whereby the latter is subjected to the former, and induced to do its bidding, instead of acting in the exercise of unconstrained volition or judgment. It is not all influence brought to bear upon the mind of the testator in the disposition of his property that may be denominated undue or fraudulent, as a friend or relative, or even those in confidential relation, may employ argument, or even persuasion to induce a bequest, so that notwithstanding it leaves the mind free to act upon its own considerations and judgment.''

▇ Scarcely any one can be said to possess a ''free volition''. Every one who is conscious of family and social duties is constrained in his volition by the obligations which he thus recognizes. . These obligations affect constantly his thinking and his conduct. They assert themselves when he writes his will; in fact, they are the only forces or convictions which determine the provisions of that instrument. Only a hermit or a hobo may be said to possess a free volition. But constraints of the kind above mentioned are not under the ban of the legal principles mentioned in the definition above quoted. Those influences have been exerted upon the mind and have convinced the judgment. They are to be distinguished from importunities, machinations and subtle appeals which overcome the will but do not convince the judgment. The latter, but not the former, constitute undue influence. Nor is it essential that the motive which prompted the testator to include in his will the contested bequest was a meritorious one.

It is usual to find kindness, friendship, affection and beneficent ministrations rewarded in testamentary documents, but the testator, if he chooses, may be actuated by base motives. The only essential is that the will which prompted him to make the bequest must be the will of the testator. This single essential negatives all imputations that a bequest, preceded by an appeal or other importunity, is invalid. Importunities and appeals which do not overcome the will without convincing the judgment are not prohibited.

As we have seen, the evidence indicates that a meretricious relationship existed between P. J. Kelly and Mrs. Northrop. The mere existence of such a relationship does not render invalid a bequest made to the paramour because one possessed of an estate may settle his bounty upon an immoral person if he chooses; nor does such a relationship create a presumption that the beneficiary exerted undue influence in obtaining the testamentary recognition. But, since the relationship which arises out of illegal amours may provide favorable opportunities for the exertion of undue influence, proof of the relationship is admissible when undue influence is charged. It is frequently said that the relationship casts suspicion upon the will, and cautions the court to examine the evidence with unusual care. Proof that the relationship existed and that the will makes an unnatural disposition of the estate, when accompanied with only a small amount of evidence that undue influence was exerted, may overcome positive denials from the paramour and her witnesses. This is due to a conviction that the usual difficulty of unmasking deceit and wrongful conduct is greatly increased when the alleged wrongdoer has employed as an aid sensual pleasures. The decisions are many in which the above-mentioned principles were

applied. Many of them are cited in 28 R. C. L., Wills, § 102, p. 148, and 68 C. J., Wills, § 468, p. 786. From *Dean v. Negley,* 41 Penn. 312 (80 Am. Dec. 620), we quote:

"Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it; and there can be no presumption of its actual unlawful exercise merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions. Such influences are naturally very unequal, and naturally productive of inequalities in testamentary dispositions; and as they are also lawful in general, and the law cannot criticise and measure them so as to attribute to them their proper effect, no will can be condemned because the existence of such an influence is proved, and because the will contains in itself proof of its effect. It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act; so the law always speaks of the natural influence arising out of legitimate relations. But we should do violence to the morality of the law, and therefore to the law itself, if we should apply this rule to unlawful, as well as to lawful relations; for we should thereby make them both equal in this regard at least, which is contrary to their very nature. If the law always suspects, and inexorably condemns undue influence, and presumes it from the nature of the transaction, in the legitimate relations of attorney, guardian, and trustee, where such persons seem to go beyond their legitimate functions, and work for their own advantage, how much more ought it to deal sternly with unlawful relations, where they are, in their nature, relations of influence over the kind of act that is under investigation. In their legitimate operation, those positions of influence are respected; but where

apparently used to obtain selfish advantages, they are regarded with deep suspicion; and it would be strange if unlawful relations should be more favorably regarded. There can be no doubt that a long-continued relation of adulterous intercourse, is a relation of great mutual influence of each over the mind and person and property of the other. History abounds with proofs of it, and it requires no very long life, or very close observation of persons around us, in order to reveal the fact.''

From *Kessinger v. Kessinger*, 37 Ind. 341, we quote:

"It will be remembered that one of the objections made to the will was, that it was procured by the undue influence of Catharine Kessinger. The charge asked, it may also be observed, was relevant to the case made by the evidence; therefore, if it contained a correct statement of the law, it should have been given. We are not able to see that the fact of marriage or absence of marriage, between the testator and Catharine, could have anything to do with, or have thrown any light upon, the question as to the testator's soundness of mind. But the charge was broad and covered all the issues in the cause; and hence, if the fact was in any way material on the issue of undue influence, the charge, in the broad terms in which it was asked, was correctly refused. If the law be, that whatever influence may be rightfully and duly exercised by a wife in procuring the execution of a will by her husband may also be rightfully and duly and exercised by a woman with whom a man is living in a state of adultery, then the charge should have been given; otherwise not. We are of opinion that there is a difference in the two cases, and that an influence when exercised by a wife might be lawful and legitimate, but which, if exercised by a woman occupying merely an adulterous relation to the testator, might be undue and illegitimate. This must be so from the very nature of civilized human society, and the domestic relations of life. Without entering upon any general discussion of the question,

we content ourselves with a reference to the authorities which support this view. 1 Redf. Wills, pp. 531-2-3; Dean v. Negley, 41 Penn. St. 312; Monroe v. Barclay, 17 Ohio St. 302; Delafield v. Parish, 25 N. Y. 9. It follows that the charge asked was correctly refused."

In the following decisions the courts found that the paramour, serving in the capacity of housekeeper or nurse, had gained ascendancy over her associate in the meretricious relationship, and had then exercised influence of an undue character to procure a will favorable to herself. The wills were held invalid: *Hyatt v. Wroten*, 184 Ark. 847 (43 S. W. (2d) 726); *Griffith v. Benzinger*, 144 Md. 575 (125 Atl. 512); *Central Trust Co. v. Boyer*, 308 Pa. 402 (162 Atl. 806).

■ In the present instance, we are satisfied that Mrs. Northrop gradually gained great influence over Kelly. She severed him from his past by rearranging the household, introducing new articles into it, and by eliminating from his dooryard the two living remembrances of deceased members of his family. Due to her attitude some of Kelly's old-time friends ceased making visits and a friend or two of hers took their places. Her influence with him was a progressive one. In money matters it steadily became more effective. First, it gained for her a stipend of $30 a month. Then came a check for $800. Next, if we believe her testimony, she obtained a promise that "the home and the acreage, the house over on Steele was to be mine". A month or so before Kelly's death she obtained $1,000 more. About this time we find her with a key to Kelly's safety deposit box and asserting that all of its contents belonged to her. The moment when death struck she departed from Kelly's home with her suitcases filled with whatever valuable documents she had not already taken into her possession.

It may be that Mrs. Northrop's interest in Kelly was the result of genuine affection upon her part. Her hurried departure after the death, it seems to us, is at variance with such a claim. The fact that she did not obtain a divorce from her husband and marry Kelly can not be reconciled with a claim of affection for him unless a divorce was unobtainable. But Northrop, who manifested no friendship for the contestants, testified that he was always willing that his wife have a divorce. The circumstance that Kelly's act in signing the will caused Mrs. Northrop to express great joy, when an affectionate friend would have contemplated with distress the act of will-making upon a deathbed also casts doubt upon her claim. Her conduct in creating two humiliating and unnecessary scenes in Kelly's room only a few hours before life left him is at strange variance with her claim. The amount involved was wholly insufficient to justify her act. Moreover, she had no interest in either the apples or the money. When she provoked this wholly unnecessary scene she knew, or must have known, that Kelly's life was near its close. To make this scene more distressful for Kelly she summoned as witnesses Mr. and Mrs. Lou Kelly who certainly must have desired that Kelly's passing should be peaceful. This woman who asserts a claim of affection was the only person ever to have caused Kelly to become involved in an altercation with his brothers. This distressing incident would seem senseless, and, since it occurred after the will had been executed, it would seem of no consequence to the will-making, were it not for the fact which we shall now mention, or, rather, mention again. When Mrs. Northrop, by remaining in the room after Jack had left, discovered that her charge against him had caused Kelly to declare that he could have "cut him (Jack) clear off" she quickly saw to it

that the lawyer who had prepared the will called upon Kelly again. She was the residuary legatee and if Jack was cut "clear off" her bequest would thereby be increased.

It seems to us that evidence is present which indicates that Mrs. Northrop's interest in Kelly was mercenary. We have just mentioned one incident of a convincing character. We shall now mention more. Mrs. Northrop had been in Kelly's home only one day when she expressed a purpose to "set her cap" for Kelly. She soon discovered that Kelly had wealth but no immediate relatives. She mentioned this discovery to her friend, Ruth Anderson, and accompanied her statement with the narrative about the California woman who rewarded a kind friend with a substantial bequest. She sought upon that and two other occasions the help of Mrs. Anderson in her efforts to persuade Kelly to remember her in his will. About this time she claims that Kelly actually promised her that he would give her certain pieces of property, the identity of which we need not mention again. That she was talking to Kelly upon the subject of gifts or devises is indicated, not only by her testimony but also by that of Kelly's cousin who swore that Kelly told her that Mrs. Northrop was "pestering" him to make a will. The cousin's testimony shows that Mrs. Northrop wanted the home place. It also indicates that Kelly had made up his mind not to give it to her and not to make a will. Mrs. Northrop's efforts to gain recognition were not unfruitful. The will was not forthcoming but gifts now came pouring in upon her. First came a stipend of $30 a month, then a gift of $800, and next one of $1,000. Finally, there came the purported gift of a safety deposit vault from which she removed, after Kelly's death, bonds which he had valued at $30,000. These bonds are not listed in the

inventory which she filed as executrix of the estate, and, hence, we assume that she claims that they are now her property.

We are satisfied that Mrs. Northrop, over a long period of time, was importuning Kelly to make a will in her favor. She sought the help of Mrs. Anderson upon three occasions. That she went directly to Kelly herself with a plea in her own behalf is indicated by the fact that she claims that he promised her "the home and the acreage, the house over on Steele". Kelly's cousin, as we have seen, testified that Kelly declared to her that Mrs. Northrop had been "pestering" him to make a will. Before the attorney who wrote the instrument was summoned Mrs. Northrop stated to Kelly's cook that he had made no will but that she was going to see to it that he do so. It was Mrs. Northrop herself who summoned the attorney upon the occasions when Kelly spoke to him about the disposition of his property. Upon the first occasion when the attorney called, Mrs. Northrop evidently proposed that he also be her attorney and she, therefore, inquired of him about a divorce for herself. It will be observed that Kelly, in spite of these importunities, postponed making his will until illness had finally laid him helpless upon his deathbed. In fact, he did not give directions about a will until he had experienced a very bad night and the situation was such that Mrs. Northrop urged the attorney to come quickly; in fact, the available time was so short that the will was written by hand. The attorney's visit was preceded by a plea to the stricken man: "Daddy, you won't go and not leave your baby anything? If you do I'll cry." From the time that the attorney arrived until he departed Mrs. Northrop, according to her own admissions, was in the room four times. Once she brought tax receipts, another time some mortgages,

another time she remained for a few minutes searching for a pen, and the fourth time (while the attorney was downstairs) she remained an hour while Kelly ate his lunch. Somehow this man's determination not to make a will in Mrs. Northrop's favor had been overcome, but not until he lay helpless upon his deathbed, and Mrs. Northrop had been with him night and day for more than two weeks.

■ It seems to us that the bequest to Mrs. Northrop, in addition to the gifts which were made to her during Kelly's life, is an unnatural one. That circumstance is an item of evidence entitled to weight in a proceeding of this character. Before leaving the subject, we take note once more of the fact that Kelly had never announced any intention of making Mrs. Northrop the residuary legatee of his will. His expressed intention contemplated that she receive nothing. Had he, from unrestrained volition, intended to include her in his will he would have had no occasion for giving her the $1,000 a few days before his death, and of adding to that gift the purported gift of a safety deposit box filled with $30,000 worth of bonds. The will could have included the two gifts as well as the bequest.

We are not satisfied that Mrs. Northrop told Kelly the truth about her relationship with her husband, and this leads us to discredit her testimony about the will. She swore that her husband several times made threats against Kelly's life, and even related an incident when she claims that Northrop, under cover of darkness, went forth with gun in hand to carry into execution his threats. Northrop disclaims all of this and says that he and Kelly were friends. She swore that she and Northrop lived together as man and wife for three months after the gun incident.

Then there is also the mysterious alienation of affections case. Northrop indignantly denied that he had sponsored this contemplated action, but an attorney had been hired and several persons were busying themselves with the preparation of the claim. Somehow the matter was dropped. Possibly Kelly's death was the cause, but about the time when we hear no more of this contemplated action Northrop and his wife effected a property settlement and Mrs. Northrop was receiving more gifts, or alleged gifts, than ever before.

■ Let us not lose sight of the fact that much valuable evidence has been destroyed by Mrs. Northrop. We have reference to her destruction of her letters to Kelly which she found in the house when she came to nurse him through his last illness. She concedes that she burned them a few days before the death. It will be recalled that she wrote to Mrs. Anderson concerning her letters to Kelly: "Be hell if some of his kin got hold of them." The destruction of evidence, when unsatisfactorily explained, warrants an inference that the documents were unfavorable to the person who destroyed them: Wigmore on Evidence (2d Ed.) § 278. Some of these letters, and especially Kelly's letter to her which she also destroyed, surely would have supported her claim if the facts were as she alleges.

In cases of this character the courts frequently dwell upon the unlikelihood of direct evidence of the wrongful act being available, especially if the wrongdoer was cunning, crafty and secluded his victim. See, for instance, *Wayne v. Huber*, 134 Or. 464 (291 P. 356, 294 P. 590, 79 A. L. R. 1427). In the present instance, sensual pleasures were employed, and for about two weeks before the will was prepared Mrs. Northrop was in Kelly's room both night and day. In that same period of time more than one of Kelly's old-time friends com-

plained of the difficulty they experienced in gaining the privilege of a visit with him, and others swore that when they had finally got into the room they were soon told by Mrs. Northrop to leave. She rarely left the room when a visitor was present. She resented, in an outburst of anger, Jack's and Lou's inquiry to the physician concerning the desirability of employing an additional nurse.

It is a serious matter to declare a will invalid. Another cannot be written. But after having bestowed upon this cause careful attention, we are satisfied that there is much circumstantial evidence in the record that forcefully indicates that Mrs. Northrop overcame Kelly's will without convincing his judgment. Her denials, in our opinion, do not suffice. The trial judge who saw the witnesses believed that undue influence was exercised, and we are of the opinion that he did not err.

 Proponents further contend that the entire will should not be held invalid merely because a portion is defeated. They argue that the executors should be permitted to proceed with the administration of the estate. The executors nominated in the will are Mrs. Northrop, Jack Kelly, and the aforementioned attorney. Jack refused to serve, and we are satisfied that the attorney has been guilty of no wrong whatever. However, all of the heirs and all of the beneficiaries of the purported will, including Elmer McClure, but excepting Mrs. Northrop, have joined in the contest. We are satisfied that this is an instance where the will should be set aside in its entirety.

The decree of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.

CAMPBELL, C. J., and KELLY and BELT, JJ., concur.