Argued January 18; reversed February 15; rehearing
denied March 14, 1939

# BLISS *v.* BAHR

(87 P. (2d) 219)

Department 2.

*John P. Hannon,* of Portland, for appellant.
*James J. Crossley,* of Portland, for respondent.

BELT, J. This is a suit commenced on the 29th day of June, 1937, to set aside and cancel a deed alleged to have been executed through undue influence. It is also contended by plaintiff—although somewhat inconsistent with the theory of undue influence—that the plaintiff Sam Bliss and his wife Maggie, now deceased, executed the deed in consideration of the promise of the defendant to take care of Maggie Bliss for the remainder of her life and that defendant failed and refused to perform her part of the contract. Plaintiff further alleges in the complaint that prior to the execution and delivery of the deed defendant "promised that at any time that the said plaintiff, Maggie Bliss, should request a re-deed or re-conveyance of the aforesaid real property to the said plaintiff, Maggie Bliss, or the said plaintiffs, that defendant would reconvey and re-deed the said property to the plaintiffs; that said plaintiff, Maggie Bliss, has many times demanded of the said defendant that she reconvey and re-deed said property to said plaintiff and that said defendant has continuously wrongfully and willfully declined to so do * * *." Notwithstanding the allegations in reference to a contract, we note in paragraph V of the complaint that defendant Edith Bahr, "took over and assumed the care and management of the household of plaintiffs and also rendered certain personal services to the plaintiff, Maggie Bliss, with the express understanding that the same were gratis and defendant would not accept or expect any pay or compensation for such services."

Defendant, in her amended answer, denied having exercised any undue influence over the plaintiffs in the execution of the deed. She also, in one part of her answer, denied having made any contract to care for

her sister during her lifetime but alleged affirmatively, "that the defendant was at all times ready, willing, and able to perform her part of the agreement, and to remain at the home of the plaintiffs as long as the plaintiff, Maggie Bliss, was alive, but the plaintiffs would not allow her to carry out her promise and agreement * * *."

Under this confused state of the pleadings, the trial court, after hearing on its merits, dismissed the suit. From this decree, the plaintiff, Sam Bliss, appeals.

Sam Bliss and his wife Maggie for approximately forty years had made their home on a five and one-half acre tract in Multnomah county, Oregon. Sam was seventy-three years of age and Maggie at the time of her death on August 1, 1937, was seventy years old. They had been married about forty-three years, living together in comparative peace and happiness. Maggie was an energetic, thrifty and industrious woman and seemed to be possessed of good business judgment. Sam was an easy-going sort of fellow who apparently depended upon his wife to keep the "home fires burning." At the time of the conveyance in controversy, the home place, having an approximate valuation of $5,000, constituted substantially all their property. The annual income from this five and one-half acre tract did not exceed $30.

In 1935 Maggie became ill with that dread disease cancer of the lower end of the spine. Her condition gradually became worse and she was confined to her bed continually during the greater part of the last year of her illness. Opiates and narcotics were often administered to relieve her pain and, in her hopeless struggle, she called upon various doctors for professional services.

Maggie's youngest and only surviving sister, the defendant Edith Bahr who was fifty years of age, lived at Rome, New York. Maggie had not seen Edith for about forty years but corresponded with her during the last few years of her life. On August 22, 1936, Sam Bliss wrote to Edith urging her to come to Oregon as "Maggie wants to see you bad" and stating in effect that his wife had not long to live. Sam offered to send a check covering the expenses of the trip and closed the letter with an expression of love and affection. Daniel Pritchard, a cousin of Maggie, testified that, at her request, he also wrote to Edith in September, 1936, telling about the serious condition of her sister and stating that "she wanted Edith Bahr to be there to wait on her."

Edith Bahr decided to go to Oregon to take care of her sister but, before going, she wrote to a Portland friend of the Blisses, inquiring "what Maggie and Sam Bliss' financial condition was and what property they owned and what money they had." Edith, before leaving for the West, also wrote the following letter, dated May 31, 1936, to Mr. John P. Hannon, attorney for the Blisses:

"You will be surprised too here from me. however I am going to write you a few lines. I am so worried about Magie. I received a latter from Sam telling me she can't get well and that she has fallen and broke her arm. I am just sick over it. Do you think I should come too see her. It is a long ways but I would love to be with her. I dont think she cares much for Sam's folks. Do you think you could have a *little talk by yourself with her*: about *me*. She has tole me all-ready that she dident want them too have any-thing there when she is gone. You know Mr. Hannon it is quite an expence too come out there but if you think it would be *worth while and they would do what is right with me*

*and how they would like too fix it,* I would try and come. I think I could burrow the money. Mr. Hannon, perhaps I am doing wrong writing this too you, but Magie is on my mind every minute. I want to do what is right. *Still I must figure a little for myself too.* You don't blame me for that. I know Sam will have to be taken care of if Magie dont get well. Mr. Hannon please drive out and see Magie. See that she has good care For Me.

"You don't need to be afraid to tell me any-thing. *No one will ever know it. This is just between you and I.* "Please write soon." (Italics ours.)

In explanation of the letter to Mr. Dyer the defendant testified, "Well, the reason I wrote this letter is I borrowed this money to come out West, $300, and I had to know.  *  *  *  Yes, that was why I asked him about those people's affairs, I had to pay that money back to those people that I borrowed it from in the East, and I would have to pay my expenses both out and back." It is difficult to understand, however, why Edith did not ask Sam to forward check covering traveling expenses as he had offered to do so in his letter to her.

Edith, whose husband had been dead for about three years, came to Oregon by automobile arriving here September 20, 1936. She was accompanied on the trip by La Verne Stevens, a widower thirty-three years of age and a salesman for the Hoover Company. They stayed at auto camps en route here but, as she says, occupying separate apartments. Edith took Mr. Stevens to the Bliss home where he remained for three or four months in order, as she says, to enable him to get established in his business here in the West. It seems that Mr. Stevens was a sort of pest around the house and he was finally told to leave. It was this

same Mr. Stevens who testified in the trial supporting the contention of the defendant that she was driven from the Bliss home on account of Sam's mistreatment of her.

Edith testified in substance that after her arrival she assumed the burden of the household work, including cooking, and that she also acted as nurse for her sick sister. Other witnesses who, as neighbors, had been frequent visitors at the Bliss home, testified, however, that Sam was the "old reliable" and did most of the work around the house. We pass this phase of the case as being unimportant, since there is absolutely no evidence tending to show that the deed in question was made in consideration of any promise or agreement by Edith Bahr that she would render such services. Edith states positively that there was never any such agreement but that, after the deed was delivered to her, she told her sister she "would stick with her." In reference thereto witness the following part of the record:

"Q. Then, in the name of all that is good and pure, tell me this—Edith Bahr, when did you make an agreement with Maggie Bliss to take care of her and nurse her? A. I never made any agreement with her.

"Q. You never have? A. Any agreement for what?

"Q. To nurse her and to take care of her? A. In consideration of what?

"Q. In consideration of giving you a deed to the property? A. There was no agreement made with me by her, or anything. No, and nothing was said about wages or anything.

"Q. And then you were not bound in any way to stay there and take care of Maggie Bliss, after she gave you that deed, except your word of promise? A. No.

"Q. Did you ever promise that you would do that? A. No."

There is evidence tending to show that Edith, shortly before the execution of the deed, called at the law office of David Lofgren in the city of Portland and advised him about Maggie's wanting to make a change in her will. Edith admits having told Lofgren about such matter, but asserts she did so at the request of her sister. Lofgren also testified that Sam came to his office in reference to the same matter. Lofgren had never acted as attorney for the Blisses. He telephoned Mr. Hannon who had been their lawyer for many years and advised him of Maggie's request to make a change in her will. He states that Mr. Hannon responded: "Well, they seem to be a little peeved at me now, and if they are going to change attorneys, I do not know of any other attorney I would rather see get the business than you." On cross examination, Mr. Hannon asked Lofgren, "Didn't I say: 'It is quite proper for you to go, that clients had a right to change attorneys at any time, but for God's sake, do what you can to prevent those two old people being robbed by Edith Bahr.' Didn't I say that at that time?" and the latter replied, "Yes, and at other times." At this juncture it may be well to state that Sam and Maggie several years before—the record is not clear as to the definite date—had executed joint wills bequeathing and devising their property to Edith Bahr and her brother, Henry Pritchard.

Mr. Lofgren, in response to the request for his services, went to the Bliss home on the afternoon of November 2, 1936, taking with him blank forms of a deed and a will. After visiting with Maggie for some time, he said he asked her "what she had in mind." Maggie complained about the expense of probating a will and, according to Lofgren, inquired if there was any way that could be avoided. Thereupon Lofgren

suggested the execution of a deed reserving to the grantors a life estate. Maggie said, ''Well, that is the thing to do  *  *  *  after we are done with this property I want it to go to Edith Bahr.'' Lofgren said he explained to Sam Bliss and Maggie that if the conveyance was made the property could not be sold ''unless Edith Bahr will join with you in the deed,'' but admits that he never explained to them the difference between a deed and a will as to the time of taking effect—the deed upon delivery and the will upon the death of the testator. Maggie was propped up in bed and the deed reserving a life estate in the grantor was executed, thereby conveying to Edith Bahr the home which Bliss and his wife had occupied for forty years. Mr. Lofgren said Maggie paid him $5 for his services and that Sam contributed his share by giving him a jug of cider. Upon delivery of the deed to Edith, the will above mentioned was torn into pieces and burned. Edith immediately turned the deed over to Mr. Lofgren ''to keep for her''. It was not recorded until January 28, 1937.

Soon after Edith obtained the deed—only a month and twelve days after her arrival—Sam, who was already on public relief, realized how futile it was for him to try to keep the home when the annual income would not even pay the taxes. He soon became persistent in his efforts to get the deed back and, no doubt, worried his poor sick wife much about the matter.

Sam made many requests of Edith for a return of the deed but she refused. Finally, in desperation, he obtained, on May 23, 1937, a note from his wife, who was then confined in the hospital. This note was addressed to Mr. Lofgren directing him to give the deed to Sam but Lofgren, in keeping with Edith's directions,

refused to comply. It was on the 19th day of June, 1937, that, with a trembling hand, Maggie joined with her husband in the verification of the complaint seeking to set aside and cancel the deed.

Relative to the physical and mental condition of Maggie at the time the deed was executed, there is great conflict in the evidence. Some witnesses, including the defendant, would have the court believe that Maggie was a keen, alert person in full possession of her mental faculties and only occasionally suffered from pain. However, let us turn to the testimony of Dr. H. V. Adix who had been the family physician for many years and who waited on Maggie for approximately a year. He said that he first prescribed narcotics to relieve her pain in March, 1935. He made numerous visits in September, October, and November of 1936 and always prescribed narcotics to relieve her intense pain. He saw her again on January 10, 1937, and last prescribed narcotics for her on May 29, 1937. In reference to her condition, the record thus speaks:

"Q. What was the nature of the treatment that you were giving her from September to May? A. Well, the pain was so intense and she was so worried about it, I had to give her narcotics. It was the only treatment. Her case was hopeless.

"Q. And from your observation and treatment of her, what would you say was her physical and mental condition, to explain the circumstances of the deeding of the real estate that she possessed, on the 2nd day of November, 1936? A. From the amount of narcotics that she had been taking for a month previous to that, I would not think she would be responsible to sign anything."

In striking contrast to the above testimony, Edith testified that between the time she came in September,

1936, and November 6, 1936—after the execution of the deed—"no opiate was given to Mrs. Bliss * * * Maggie wasn't any hand to take medicine at all." Edith said that Maggie was always keen and alert—even during the time she was in the hospital. Relative to Maggie's suffering, Edith thus testified:

"Q. Did she cry? A. Why Maggie would wipe a few tears from her eyes. From a girl she had been a person who cried very easily.

"Q. And Mrs. Bahr, the tears that Maggie Bliss shed while on her last bed there, were they not caused because of her illness, or was it just her nature? Is that what you want this Court to understand? A. Well, it was her nature. She had a right to wipe the tears away from her eyes.

"Q. And those opiates and this medicine that the doctors had been giving her for over a year was not necessitated by any desire to relieve pain? A. Now, Mr. Hannon, Maggie didn't have any opiates whatsoever unless it was in the Portland Sanitarium, under observation, for an examination."

Since there is no evidence tending to show that the deed was executed in consideration of any promise by the defendant to render services, it follows that the deed, if sustained, must be based upon the theory of a gift. The vital question in the case, therefore, is whether this deed evidencing a gift was procured through undue influence or was the free and voluntary act of the grantors who understood and appreciated what they were doing. Did Edith Bahr, by reason of her position of trust and confidence, exert such an influence over her sister that the latter was unable to act upon her own judgment? Was Edith able to substitute her will and judgment for that of her sister?

■ The burden of proving undue influence rests upon the party who asserts it. Undue influence, being a spe-

cies of fraud, is rarely susceptible of direct proof. Those who are actuated by wrongful motives generally operate in the dark. No hard and fast rule can be laid down to determine whether undue influence has been so exercised as to destroy the free agency or will of a grantor in a deed. Each case must be determined upon its own facts and circumstances.

█ In the instant case a confidential relationship existed between the defendant and her sister. As stated in *Rowe v. Freeman*, 89 Or. 428, 437, 172 P. 508, 174 P. 727:

"A fiduciary relation may exist in the absence of a trust or agency. It is found with its accompanying burdens and disqualifications wherever there is confidence reposed on one side and resulting superiority and influence on the other  *  *  *."

In view of the evidence tending to show that Edith sought to use such relationship to procure this conveyance by way of a gift when her sister was in a weakened physical and mental condition, the deed is presumed to be invalid, and the burden of proceeding shifts to the defendant who is the recipient of the gift to offer evidence that no undue influence was exercised and that the transaction is fair and equitable. It is not the existence of the confidential relationship alone that constitutes undue influence, but it is the wrongful use thereof which invalidates the conveyance: *In re Rupert's Estate*, 152 Or. 649, 54 P. (2d) 274; *In re Knutson's Will*, 149 Or. 467, 41 P. (2d) 793; *In re Dale's Estate*, 92 Or. 57, 179 P. 274; *Sawyer v. White*, 122 Fed. 223.

In 12 R. C. L. 953, the rule applicable is thus stated:

"A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and

unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of a gift the onus of establishing its absolute fairness   *   *   *''.

■ Did the defendant overcome the presumption of the deed's invalidity? At the very threshold of the case the defendant is confronted with a letter which she wrote to Mr. Hannon before coming to Oregon wherein she plainly evidenced much concern about the property of her sister who was then on her deathbed. This letter, indeed, reflects no credit upon the defendant. What was uppermost in her mind? Did she expect Mr. Hannon to violate the confidence reposed in him by his client? What occasion was there to act in the dark and conceal anything from her sister? The only fair inference that we can draw is that the defendant came west with the fixed purpose to get all the property she could from Sam and Maggie. The letter throws a cloud of suspicion over her subsequent conduct.

The defendant, as a witness, was entirely too evasive and contradictory. If she was so deeply concerned about the welfare of her sister, knowing the deed was causing her much concern, why did she not, in a spirit of fairness, return it and be content with payment of her traveling expenses? As we view the record, it is very doubtful whether Maggie was in any physical or mental condition to transact business. It was an unconscionable transaction for the defendant to take as a gift substantially all the property which these old people owned.

It may well be inquired, Why did Sam execute the deed? He very frankly says that Edith never asked him to make any conveyance of his property as ''she

knew better." He testified, however, that Edith continually "nagged" Maggie for a deed and that he joined in the execution thereof to pacify his wife. While some of the testimony of the plaintiff is improbable and unreasonable, we are inclined to believe that he told the truth in the above-mentioned particulars.

We are not unmindful of the will which, it is urged, shows a continuity of purpose or a fixed plan of Sam and Maggie thus to make the defendant the beneficiary of their estate. Ordinarily, a former will substantially conforming to the terms of one being contested refutes the idea of undue influence: *Blochowitz v. Blochowitz,* 122 Neb. 385, 240 N. W. 586, 82 A. L. R. 949, and cases in note. It will be recalled, however, that, in the instant case, the will devised and bequeathed the property to Edith Bahr and her brother Henry Pritchard. It is significant that Henry Pritchard was not named as a grantee in the deed. Furthermore, it was far more reasonable for Sam and Maggie to execute joint wills—since they would still retain their property until death—than to execute a deed taking effect upon delivery. While the will is an important factor, it is not considered of sufficient weight to overcome the presumption of undue influence arising by reason of the confidential relationship and the evidence indicating that such relationship was used by defendant to accomplish the purpose which she had in mind in coming west.

On an issue of fact we are reluctant to disturb the findings of the trial judge who had the advantage of hearing and seeing the witnesses but, after a careful examination of the record, we are convinced that the defendant took advantage of her position of trust and confidence to procure the execution of the deed in question.

It follows that the decree of the lower court in dismissing the suit is reversed and the cause remanded with directions to cancel and set aside the deed. Neither party will recover costs or disbursements.

RAND, C. J., and BAILEY and LUSK, JJ., concur.