MILFORD PACKING COMPANY, INC., a corporation of the State of Delaware, Plaintiff, v. EARL L. ISAACS, JOHN HOWARD ISAACS, HARRY C. ISAACS, DOROTHY M. ISAACS, MARY C. ISAACS, and JOHN S. ISAACS, Trading under the Firm Name of John S. Isaacs & Sons, and EARL L. IAACS, JOHN HOWARD ISAACS, DOROTHY ISAACS HALL and HARRY C. ISAACS, Executors of the Estate of John S. Isaacs, Defendants.

*(April* 15, 1952.)

HERRMANN, J., sitting.

*H. Albert Young* (of Young and Wood) for Plaintiff.

*Samuel P. Russell* (of Tunnell and Tunnell) for Defendants.

Superior Court for New Castle County, No. 724, Civil Action, 1949.

HERRMANN, J.:

This cause having come on for trial before the Court, trial by jury having been expressly waived by both parties, and the evidence adduced by the parties having been duly considered, the Court makes the following

Findings of Fact

1. The plaintiff was engaged in the business of processing and packing dill pickles. This business included the purchase of raw cucumbers from farmers and the processing of the said cucumbers in barrels. The processing methods of the plaintiff involved a partial fermentation followed by cold storage warehousing to arrest further fermentation until the pickles were ready for marketing.

2. The defendants were engaged in the business of operating a cold storage warehouse at Georgetown, Delaware.

3. During July and August of 1948, the plaintiff delivered 2,488 barrels of dill pickles to the defendants for cold storage and the defendants issued non-negotiable warehouse receipts therefor.

4. The defendants accepted the plaintiff's pickles for cold storage and agreed to maintain them at such temperature as would prevent the pickles from becoming damaged or spoiled. Specifically, the defendants undertook to store the plaintiff's pickles at a temperature of not less than 32° F. Pickles freeze at that temperature.

5. The freezing of pickles results in their complete deterioration and destruction.

6. The plaintiff agreed to pay and the defendants agreed to accept storage charges at the rate of $1.75 per barrel until January 1, 1949, and $0.25 per barrel per month thereafter until withdrawn from the warehouse.

7. At various times, from December 1, 1948, to April 27, 1949, the plaintiff withdrew 1,894 barrels of pickles from the defendants' warehouse.

8. On April 27, 1949, the defendants demanded payment of all storage charges then due, including charges on the 1,894 barrels previously withdrawn. The plaintiff refused to comply with this demand and the defendants refused to permit the plaintiff to make further withdrawals. As a result, the defendants retained in their possession 594 barrels of the plaintiff's pickles.

9. Of the 1,894 barrels withdrawn by the plaintiff, 300 barrels of pickles were frozen while in the care, custody and control of the defendants; of the 594 barrels retained by the defendants, 70 barrels of pickles were frozen while in their care, custody and control.

10. The freezing of the pickles resulted from the failure of the defendants to store them at a proper temperature. The freezing was caused by defective insulation between those portions of the defendants' warehouse in which the pickles were stored and other portions of the warehouse, known as "Zero Rooms", which were kept at subfreezing temperatures.

11. The defendants knew or should have known of the defective insulation.

12. As to the 370 barrels of pickles which were frozen, the defendants failed to exercise the care which a reasonably careful owner of similar goods would have exercised. The destruction by freezing of the said 370 barrels of pickles was caused by the negligence of the defendants.

13. In the Winter of 1948-1949 and in the Spring of 1949, the reasonable value of pickles, such as those stored by the plaintiff in the warehouse of the defendants, was $27 per barrel. Therefore, the reasonable value of the 370 barrels of pickles would have been $9,990 if they had been stored properly and delivered to the plaintiff in good condition.

14. After freezing, the 370 barrels of pickles were completely destroyed and worthless.

15. The manufacturing of dill pickles, such as those processed by the plaintiff, is a business of financial hazard by reason of the highly perishable nature of the product. It is not improbable that a processor may sustain a loss of 20% or more of the total volume packed by reason of the deterioration of certain of the pickles into "bloaters". Proper warehousing will not prevent this loss factor.

16. Except for the 370 barrels of pickles which were frozen, no other loss sustained by the plaintiff, as to the pickles stored in the defendants' warehouse, resulted from the failure of the defendants to maintain proper temperatures for the storage of the plaintiff's product.

17. The only payment made by the plaintiff on account of storage charges was the sum of $1,000 paid on April 27, 1949. The balance of the storage charges claimed by the defendants was the sum of $5,405. This sum included charges in the amount of $1,087.50 for the storage of the pickles which were frozen.

18. The defendants notified the plaintiff of their intent to enforce their warehouseman's lien for unpaid storage charges by auction sale of the pickles remaining in their possession. The defendants asserted a lien in the amount of $5,405 which included charges on the 1,894 barrels previously withdrawn by the plaintiff. The defendants fulfilled the requirements of the Uniform Warehouse Receipts Act, *Code* 1935, § 5925 regarding notice and advertising and, on August 27, 1949, the pickles in the defendants' possession were exposed to public sale. The sale

was conducted by the defendants. The defendants bid $1.00. There were no other bidders. The costs of the sale amounted to $50.

19. In January 1951, the defendants resold the pickles, which had been exposed to public sale on August 27, 1949, for the sum of $5,553. No earlier effort was made by the defendants to resell the pickles. A reasonable time for resale would have been a period of three months. Reasonable storage charges for this period of time amounted to $445.50

From the foregoing Findings of Fact, the Court reaches the following

### Conclusions of Law

1. The relationship of bailor and bailee existed between the plaintiff and the defendant. *Keith v. Booth Fisheries Company*, 4 *Boyce* 218, 87 *A*. 715.

2. The defendants are liable to the plaintiff for the destruction of 370 barrels of pickles caused by the failure of the defendants to exercise sush care in regard to them as a reasonably careful owner of similar goods would have exercised. *Ibid.*

3. The measure of the plaintiff's damages is the difference between the reasonable value of 370 barrels of pickles in their damaged condition and what their reasonable value would have been if they had been stored properly and delivered in good condition. *Ibid.*

4. The defendants are not entitled to storage charges for the 370 barrels of pickles destroyed as the result of their negligence. The defendants are entitled to storage charges for the rest of the pickles. *Ibid.*

5. In reselling the pickles which the defendants purchased at their own sale, the defendants will be deemed to have resold for the account of the plaintiff. Therefore, the proceeds of the resale, less reasonable storage charges and the costs of the public sale, will be credited against the defendants' counterclaim for storage charges.

6. Subject to the credits set forth in Conclusion 7, *infra*, the plaintiff is entitled to recover from the defendants the sum of $12,785.70, consisting of the following:

(a) The sum of $9,990, being the reasonable value of the 370 barrels of pickles which were destroyed as the result of the defendants' negligence.

(b) The sum of $1,087.50, being refund of storage charges for the 370 barrels which were destroyed.

(c) The sum of $1,708.20, being interest upon $9,990 at 6% per annum.

7. The defendants are entitled to be credited upon their counterclaim for the sum of $347.50, consisting of $5,405, being the defendants' claim for storage charges, less $5,057.50, being the net proceeds of the resale after deduction of reasonable storage charges and sale costs.

8. Judgment will be entered in favor of the plaintiff and against the defendants for the sum of $12,438.20 and costs.

### Memorandum of Decision.

Two questions of law arise in this case which merit discussion:

1. Under the Warehouse Receipts Act, *Code* 1935, § 5893 *et seq.*, does a warehouseman acquire a general lien or a specific lien against goods for which non-negotiable receipts have been issued?

2. Under the. Warehouse Receipts Act, may a warehouseman purchase goods at his own sale, resell such goods at a profit, and then recover full storage charges?

The first question was presented for decision by the plaintiff's contention that, with respect to the 594 barrels which the defendants refused to surrender because of nonpayment of storage charges, the defendants' lien thereon was limited to the

storage charges which had accrued for the 594 barrels.[1] The plaintiff maintained that the defendants wrongfully asserted a lien against the barrels on deposit for storage charges which had accrued for other barrels previously released. In short, the plaintiff urged that, where non-negotiable warehouse receipts are issued, a warehouseman has a specific lien for storage charges which is enforceable only against the goods to which such charges relate.

The plaintiff's contention would be acceptable if the common law governed the matter. The question must be determined, however, by reference to the provisions of the Delaware Warehouse Receipts Act. Moreover, the question must be determined in the light of the mandate that the statutory provisions are to be interpreted and construed so "as to effectuate its general purpose to make uniform the law of those States which enact it." *Code* 1935, § 5949.

. The pertinent provisions of our Statute appear at *Code* 1935, §§ 5919 to 5922, inclusive. Statutory provisions substantially the same as ours, and likewise adopted from the Uniform Act, were minutely scrutinized in *Harbor View Marine Corp. v. Braudy*, 1 *Cir.*, 189 *F.* 2d 481. After exhaustive review of the common law, of the genesis of the Uniform Act, and of the construction of that Act in other jurisdictions, the Court there concluded that the pertinent statutory provisions give a warehouseman a general lien rather than a specific one where non-negotiable warehouse receipts are issued. I adopt the reasoning and the conclusion stated in the Braudy case. For the reasons stated therein, it is held that the Delaware Warehouse Receipts Act gives a warehouseman a general lien where non-negotiable receipts are issued. It follows that, in the instant case, the defendants properly asserted a lien against the goods on deposit for *all* storage charges then owing by the plaintiff to the defendants, and that such lien was not restricted to the storage charges due for goods then on hand.

---

[1]See *Findings Nos. 8 and 18, supra.*

Turning now to the second question regarding the legal consequences when a warehouseman purchases goods at his own lien-enforcement sale[2], there is a surprising dearth of authority on the question insofar as I have been able to discover.

Our Warehouse Receipts Act is silent on the subject. The Statute provides only that, for the satisfaction of the warehouseman's lien, there shall be "a sale of the goods by auction"[3] after notice and advertisement as specified; that the warehouseman shall satisfy his lien and sale costs from the proceeds of the sale; and that the balance, if any, of such proceeds "shall be held by the warehouseman, and delivered on demand to the person to whom he would have been bound to deliver or justified in delivering the goods." *Code* 1935, § 5925.

 I am of the opinion that a fiduciary relation exists between a warehouseman and his depositor in matters pertaining to a lien-enforcement sale such as is authorized by the Warehouse Receipts Act.

Such fiduciary relation was recognized in *Morris v. Harder's, etc.,* 187 *Ill. App.* 72. The Court there held that where a storage company sells goods for charges and purchases such goods at its own sale, the owner may elect to treat the sale as a conversion. The Court premised its conclusion upon the duty which arises from the fiduciary relation existing between a public warehouseman and his customer.

 Generally, it is recognized that every bailment is a trust and that, while he is not a trustee in the technical sense of the word, a warehouseman holds goods in trust for his depositor. *Home Ins. Co. v. Baltimore Warehouse Co.,* 93 *U. S.* 527, 543, 23 *L. Ed.* 868; *Andrew v. Citizens' State Bank of Eagle Grove,* 203 *Iowa* 345, 212 *N. W.* 745, 51 *A. L. R.* 906; *Brooklyn Clothing Corp. v. Fidelity-Phenix Fire Ins. Co.,* 205 *App. Div.*

---

[2] See *Findings Nos.* 18 *and* 19 *and Conclusions Nos.* 5 *and* 7, *supra.*

[3] As in the instant case, the sale may be conducted by the warehouseman himself, without intervention of constable, sheriff or other public officer.

743, 200 *N. Y. S.* 208; *Stillwell v. Staples,* 19 *N. Y.* 401, 403; *Rice Oil Co. v. Atlas Assur. Co.,* 9 *Cir.,* 102 *F.* 2d 561; 6 *Am. Jur. "Bailments"* § 57. Then, too, it is clear that the Statute places a warehouseman in a trustee-like position in that it imposes upon him the two-fold duty of obtaining the best price possible for the goods of the depositor, when sold to satisfy the warehouseman's lien, and of acting for the benefit of the depositor or his assigns with respect to the residue of the proceeds of such sale after deduction of charges and costs. A fiduciary relation is said to exist where there has been confidence reposed in one who in good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. 36 *C. J. S., Fiduciary,* pp. 742, 744. It may exist in the absence of a specific or technical trust or agency. *Bliss v. Bahr,* 161 *Or.* 79, 87 *P.* 2d 219, 223; *Lindholm v. Nelson,* 125 *Kan.* 223, 264 *P.* 50. The term connotes a relation of trust which, in my opinion, is established when a warehouseman exposes a depositor's goods to auction sale, pursuant to the provisions of the Warehouse Receipts Act, without judicial supervision or surveillance and without the insulation of any impartial public officer.

The conclusion that, with respect to a lien-enforcement sale, a warehouseman is a fiduciary compels the further conclusion that a warehouseman must be subjected to and governed by the "universal and stern" rules governing fiduciary and trust relations. Under those rules, the purchase by the fiduciary of the subject matter of the relationship is considered to be improper in the absence of special circumstances; a fiduciary is prohibited from purchasing from himself at his own sale; if the fiduciary does purchase at his own sale and later resells, the principal is held to be entitled to any profit on the resale, after reimbursement to the fiduciary of proper expenditures; and the rules are applied without regard for good faith. 54 *Am. Jur. "Trusts"* § 453 *et seq.;* § 455.

The rationale of the rules is that a fiduciary should not be permitted to be in the position of both seller and buyer nor should he subject himself to the temptation which arises out

of the conflict between the interest of a purchaser, on the one hand, and the duty of a fiduciary, on the other. *Barnes v. Brown,* 80 *N. Y.* 527, 535. In this connection, it is noteworthy that the Minnesota version of the Uniform Warehouse Receipts Act contains express authority for the warehouseman to purchase at a sale for the enforcement of his lien *if* the sale is conducted by a sheriff or constable. See 3 *Uniform Laws Anno., p.* 68. It is also noteworthy, as an expression of general public policy, that a statute of this State imposes penalties upon any sheriff, constable or other person who purchases, directly or indirectly, goods sold by him by virtue of any process or order. *Code* 1935, § 4821.

In the instant case, it would be manifestly unjust to recognize the defendants' claim for full storage charges when they have already received and do now retain the difference between their bid price of $1 and the resale price of $5,553.

For the reasons stated, it is held that the defendants must be deemed to have resold the goods for the account of the plaintiff and that, with respect to the defendants' counterclaim for storage charges, the net proceeds of the resale, after deduction of reasonable charges and expenditures, must be credited to the plaintiff's account[4].

---

[4]See *Conclusions Nos.* 5 *and* 7, *supra.*