Argued May 6; affirmed June 17, 1947

ALLEN *v.* BREDING (In Re Estate of
ALICE PERRY, Deceased)

(181 P. (2d) 783)

*William W. Wells* and *John F. Kilkenny,* both of Pendleton (William W. Wells and Raley, Kilkenny & Raley, all of Pendleton, on brief), for appellant.

*C. C. Proebstel* and *George H. Corey,* both of Pendleton, for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, HAY and WINSLOW, Justices.

HAY, J.

On April 30, 1945, the County Court for Umatilla County admitted to probate, as the last will and testament of Alice Perry, deceased, a written instrument dated July 30, 1941, and appointed Ernest C. Allen as executor thereof. On May 4, 1945, Bessie Breding filed in said court her petition contesting the purported will, and offering for probate, as the last will of said Alice Perry, a written instrument, in due form, dated August 5, 1941. The executor joined issue upon the petition, and affirmatively pleaded that the will of August 5, 1941, was not in fact the will of Alice Perry, but was the result of undue influence exercised over testatrix by Bessie Breding while acting as testatrix's confidential adviser and friend. The affirmative pleading was denied by the reply. The proceedings were duly transferred for hearing to the Circuit Court for Umatilla County. A hearing was held in that court, and thereafter the court entered its decree setting aside the order of the county court which admitted to probate the will of July 30, 1941, and finding that the will of August 5, 1941, was the last will and testament of Alice Perry, deceased.

The testatrix was an elderly negress, who had resided in Pendleton, Oregon, for about forty years. She had been twice married and twice widowed. She had no children. She was born in Warren County, Kentucky, and removed with her family to Kansas in about the year 1884. In Kansas, she lived near and was well acquainted with Ernest C. Allen, the appellant herein, and his brothers, Walter Allen and Frank Allen,

who were her full cousins. The Allens removed from Kansas to Pendleton, Oregon, in the year 1904. A few years later, testatrix, with her first husband, Ephraim Young, followed them to Pendleton. Ernest Allen received them into his home, and they lived with him for a period, the duration of which is not disclosed by the evidence. Later, they purchased a residence in Pendleton, in which the testatrix resided for the remainder of her life. Mr. Young died some time later, in Seattle. Ernest Allen accompanied the widow to Seattle to bring Young's body to Pendleton for burial.

The relationship between the testatrix and Ernest Allen in those days appears to have been cordial. She relied upon him to some extent for advice on business and other matters, especially during a period of some ten years which elapsed between Mr. Young's death and her second marriage. Her second husband, Bob Perry, lived only three or four years after marriage. Subsequent to his death, testatrix resided alone, and supported herself by her own labor as a domestic servant and laundress. She was industrious and thrifty, her wants were few and simple, and she was able to accumulate considerable savings. In about 1932, because of advancing age and physical ailments, she was obliged to discontinue all gainful employment. From that time on, she maintained herself out of her savings. At her death on April 27, 1945, her remaining estate amounted in value to about four thousand dollars.

On December 9, 1931, Mrs. Perry executed a will in which she devised and bequeathed all of her estate to Ernest C. Allen, if he should survive her, whom failing, to Frank Allen and his wife, (the latter's participation being made dependent upon her husband's being alive at the death of the testatrix), and failing Frank's sur-

vival, to Walter Allen. If all the Allens predeceased Mrs. Perry, the estate was to go to a brother and sister of her first husband.

On July 30, 1941, Ernest Allen brought Mrs. Perry to the office of Mr. George R. Lewis, a Pendleton attorney, and told Mr. Lewis: "The lady wants you to fix some papers." Mr. Allen thereupon retired, and Mr. Lewis, instructed by testatrix as to her wishes, prepared a will devising and bequeathing all testatrix's property to Ernest C. Allen and Ella Allen, his wife, share and share alike, and to the survivor of them, and, if neither should survive testatrix, to Frank Allen and Mattie Allen, his wife, or to the survivor of them. Ernest C. Allen was appointed executor, without bonds. We shall refer to this will as the Allen will. Mrs. Perry was in the habit of keeping a considerable sum of money in her safety deposit box. From this she withdrew small amounts from time to time as need arose. On September 19, 1935, she signed an authorization permitting Ernest C. Allen to have access to the safety deposit box. Although the authority clearly indicated that either of them might have had access to the box without the presence of the other, it seems that they misinterpreted it and thought that both had to be present together. In 1941, Mrs. Perry found that her physical condition made it difficult for her to get about, and she desired, therefore, to have Allen authorized to have access to the box without the necessity (as she thought) for her being present. They inquired of some person in the bank in which the safety deposit box was kept, and were advised that a court order would be necessary. Mr. Allen then talked with the county judge, Honorable Carl W. Chambers, who advised him to consult an attorney. He did so, with the result that, on August 7,

1941, he filed in the County Court for Umatilla County a petition to have Mrs. Perry declared incompetent, and for his appointment as guardian of her person and estate. Order to show cause issued on the same day, and was served upon Mrs. Perry. On August 25, 1941, a hearing was held, at which Mrs. Perry, assisted by Mrs. Bessie Breding and several other white women, opposed the petition and urged that, in the event that Mrs. Perry should be declared incompetent, Mrs. Breding should be appointed her guardian rather than Ernest Allen. After a further hearing (at which Mrs. Perry did not appear, either in person or by attorney) the court, on September 19, 1941, declared her incompetent and appointed Ernest Allen as her guardian.

On August 5, 1941, or only five days after executing the Allen will, Mrs. Perry executed a will devising and bequeathing all her estate, except for one dollar each to the three Allens, to "my friend, Bessie Breding, my neighbor who has been very kind to me and generous during my life and who has assisted me in many ways", and appointing Mrs. Breding executrix, without bond. We shall call this the Breding will. It was drawn by Mr. J. B. Perry, a Pendleton attorney. He testified that he had been acquainted with the testatrix for several years. She came to his office alone on or about August 5, 1941, and he prepared the will in accordance with her instructions. She told him that she had some money in the house and some real property in the lower end of town. She seemed to be rational, and, in his opinion, was mentally competent. She told him who her relatives were. She said that Mrs. Breding had been very kind to her, and that she wanted to give her her property. She did not mention having made the Allen will.

The drawing of the will was not completed until after the noon hour, and, although Mr. Perry could have served as one witness, he found no one readily available to act as the other. He, therefore, asked Mrs. Perry to return later in the afternoon. She complained, however, that it was difficult for her to climb the stairs, and Mr. Perry, after giving her instructions relative to the manner of signing and witnessing wills, permitted her to take the document away with her. Shortly after noon, Mrs. Perry brought the will to Mrs. Breding's house, told Mrs. Breding: "I went up and made my last will", and herself telephoned for two persons, Donald T. Robinson and Mrs. Celestine King, to act as witnesses. When these persons arrived, Mrs. Perry exhibited the document to them, and told them that it was her last will and that she wanted them to be witnesses thereto. The will was duly signed and witnessed accordingly. Mrs. Breding was present, but was seated on a davenport at the other end of the room, and took no part in the conversation.

Mrs. King testified that she was a friend of Mrs. Breding's, having known her for twenty years. At the time when the will was executed, Mrs Perry told her that she wanted Mrs. Breding to have all her property, except for one dollar apiece to her cousins, because Mrs. Breding had been kind and good to her and had looked after her. In Mrs. King's opinion, Mrs. Perry was "absolutely" of sound mind and memory, and was sane. The other witness, Mr. Robinson, had died prior to the hearing.

■ Appellant concedes that testatrix was mentally competent to execute the Allen will. She executed the Breding will five days later. Assuming that she was mentally competent to execute the Allen will, we find

no evidence that she did not remain competent for five days thereafter. The evidence satisfies us that, as a matter of fact, she knew exactly what she was doing when she executed the Breding will. She knew of what her property consisted, and how she desired to dispose of it among those entitled to her bounty. Thus, she had testamentary capacity. *In re Hart's Will,* 65 Or. 263, 132 P. 526; *In re Diggins' Estate,* 76 Or. 341, 149 P. 73; *In re Will of Robert Carr,* 121 Or. 574, 256 P. 390; *Zenger v. Wyss,* 177 Or. 382, 163 P. (2d) 285.

■ It is true that, within a litte less than two months after the execution of the Breding will the County Court adjudged Mrs. Perry incompetent, and appointed Mr. Allen her guardian. If she had testamentary capacity on July 30, 1941, as appellant insists, and also on August 5, 1941, as the lower court found and as, in our opinion, the evidence shows, the subsequent appointment of a guardian over her person and estate did not have the effect of an adjudication that she lacked testamentary capacity as of the time when she executed the Breding will. Cf. *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192, 180 P. 595; *Clark v. Clark,* 125 Or. 333, 267 P. 534; *Snyder v. De Remer,* 143 Or. 414, 22 P. (2d) 877.

Ernest Allen performed the duties of his office as guardian of Mrs. Perry's estate with scrupulous exactitude. As guardian of her person, however, he was less diligent. It is evident that, during the period of the guardianship, Mrs. Breding became much concerned over Mrs. Perry's physical condition. They had been next-door neighbors for twenty-five years. Mrs. Perry was the only colored person residing in that neighborhood, and Mrs. Breding, more than any other neighbor, appears to have been consistently kind and helpful to

her. She found Mrs. Perry suffering from lack of sufficient food, and her home dirty and uncared for. Mrs. Perry had been ill, and later had an operation for the removal of a cataract from one eye. Mrs. Breding fed her on many occasions. She was active in endeavoring to compel Mr. Allen, as guardian, to see that Mrs. Perry had proper care. Her aggressiveness in this connection seems to have irritated Mr. Allen. He felt that she was interfering in matters with which she had no concern, and wrote her a letter requesting her to leave Mrs. Perry alone, as her visits and talks affected Mrs. Perry adversely, and rendered his own position difficult. Our conclusion from the evidence, however, is that Mrs. Breding was actuated by a sincere interest in Mrs. Perry's welfare, and that her efforts to help Mrs. Perry were performed in neighborly kindness, and, no doubt, were necessary.

The relationship between testatrix and Mrs. Breding was very cordial. There is, however, no credible evidence that Mrs. Breding took advantage of such relationship in order to influence Mrs. Perry to make a will in her favor. The only evidence even suggesting such a thing was the testimony of a colored woman, a former resident of Pendleton, that she had heard Mrs. Breding tell Mrs. Perry that Mr. Allen would steal her money. Mrs. Breding positively denied having made any such statement, and there was impeaching evidence tending to show that the colored woman was unworthy of belief.

■ We think that there was nothing unnatural in the Breding will. Mrs. Perry appears latterly to have conceived an intense dislike toward Mr. Allen. In the Allen will, Mrs. Ernest Allen was made a beneficiary, although there was credible evidence that she

had on one occasion assaulted and beaten Mrs. Perry. Mrs. Perry made no secret of the fact that she had made the Breding will. She told neighbors that she would "fool old Ernest". Under all the circumstances, it was natural and commendable that she should select, as beneficiary of her estate, a woman who had been for many years her kind and generous neighbor. The fact that the beneficiary was a white woman, and was preferred over testatrix's own collateral relatives, while perhaps unusual, is not evidence of undue influence.

■■ The burden of proof of undue influence is usually upon the party who asserts it. *In re Estate of Riggs,* 120 Or. 38, 241 P. 70, 250 P. 753; *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793; *In re Rupert's Estate,* 152 Or. 649, 54 P. (2d) 274; *In re Lobb's Will,* 173 Or. 414, 145 P. (2d) 808. The existence of a confidential relationship between testator and beneficiary, however, coupled with proof that the beneficiary participated actively in the preparation or execution of the will, casts upon the beneficiary the burden of disproving undue influence. *Holman's Will,* 42 Or. 345, 70 P. 908; *In re Knutson's Will,* supra; *Bliss v. Bahr,* 161 Or. 79, 87 P. (2d) 219. There was no substantive evidence indicating that Mrs. Breding was active in the preparation or execution of the Breding will. Mr. George R. Lewis, one of Mr. Allen's attorneys, testified that, after Mrs. Perry's death, he telephoned Mr. J. B. Perry and asked him if he had drawn the will; that Mr. Perry said that he had drawn it, under instructions of a white lady who was unknown to him and who took the instrument away with her, and that Mrs. Perry was not present. This was denied by Mr. Perry, who testified, as we have stated, that Mrs.

Perry came alone to his office and that he drew the will under her instructions. No attempt was made to identify the mysterious white woman as Mrs. Breding. The trial judge considered Mr. Lewis's testimony, not as substantive evidence that the will was prepared at the behest of a white woman, but simply as tending unsuccessfully to impeach the testimony of Mr. Perry to the contrary. This was proper. *Bennett v. Spagele,* 166 Or. 449, 113 P. (2d) 207; *In re Lambert's Estate,* 166 Or. 529, 114 P. (2d) 125; *Schluter v. Niagara Fire Ins. Co.,* 124 Or. 560, 264 P. 859.

Fiduciary relationship includes not only legal and technical relations. It is found wherever there is confidence reposed on one side and resulting superiority and influence on the other. The relationship may be moral, social, domestic, or merely personal. *Rowe v. Freeman,* 89 Or. 428, 172 P. 508, 174 P. 727; *Egr v. Egr,* 170 Or. 1, 131 P. (2d) 198. Mrs. Breding is middle-aged; she is much younger than was Mrs. Perry. She was evidently Mrs. Perry's superior in education and in sophistication. Assuming that there existed a confidential relationship between these two women, undue influence is not to be inferred therefrom. Proof is lacking of the abuse of such relationship, and such proof was essential to make out a case sufficient to justify the setting aside of the will. *In re Knutson's Will,* supra; *Bliss v. Bahr,* supra. Motive and opportunity to exert undue influence were shown, but this was not enough. There should have been proof of facts from which influence amounting to moral coercion might have been inferred. *Hubbard v. Hubbard,* 7 Or. 42; *Rice v. Rice,* 95 Or. 559, 188 P. 181; *Re Estate of Lawrence K. Moore,* 114 Or. 444, 236 P. 265; *In re Wayne's Estate,* 134 Or. 464, 291 P. 356, 294 P. 590;

*In re Linville's Estate,* 137 Or. 145, 300 P. 505. Mrs. Breding, indeed, knew that Mrs. Perry intended to make her the beneficiary of her will, and admitted telling Ernest Allen that "it was an awful dirty trick to force her (Mrs. Perry) to make her will and then file papers to have her made an incompetent person". She testified, however, that she did nothing to influence Mrs. Perry against Mr. Allen. Whatever influence may have arisen in Mrs. Perry's mind in favor of Mrs. Breding as the result of gratitude, affection or esteem, was not undue influence, unless it was so powerful as to have destroyed the free agency of the testatrix at the time of the execution of the will. *In re Sturtevant's Estate,* supra (92 Or. 269, 178 P. 192, 180 P. 595); *In re Estate of Allen,* 116 Or. 467, 241 P. 996; *In re Will of Robert Carr,* supra (121 Or. 574, 256 P. 390). The evidence, in our opinion, shows no such situation, but simply shows that the testatrix, for reasons that seemed sufficient to her and which were not based upon any delusion as to the facts, determined to revoke the Allen will, and thereupon, not unnaturally, selected Mrs. Breding, her friend and benefactor, as her beneficiary. *Zenger v. Wyss,* supra (177 Or. 382, 163 P. (2d) 285).

■ Mrs. Perry was declared incompetent, as we have stated, as of September 19, 1941. On April 2, 1945, the county court duly adjudged her to be mentally diseased and unsafe to be at large. The nature of her mental disease, as found by the court upon the testimony of examining physicians, was "senility". Senile dementia is a form of mental disorder resulting from old age. It brings about a diminution of the mental faculties. It begins gradually and is progressive in character. *Byrne v. Fulkerson,* 254 Mo. 97, 162 S. W.

171. In the Allen and Breding wills, Mrs. Perry gave her age as sixty-one years, but was undoubtedly older. The order adjudicating her insane gives her age as seventy-five years. The fact that she was afflicted with senile dementia in 1945 obviously does not even suggest the propriety of an inference that, in 1941, she lacked testamentary capacity.

We think that counsel for Mr. Allen lay too much emphasis upon the fact that the testatrix was colored and the beneficiary white. In some situations, that fact might have weight, but, under the peculiar circumstances of the case at bar, it does not either raise or sufficiently support an inference of undue influence.

We are of the opinion that Mrs. Perry, at the time when she executed the Breding will, had and exercised sufficient testamentary capacity, and that such will was not the product of undue influence. The decree is affirmed, with costs.