Argued November 18, reversed December 16, 1959, petition
for rehearing denied February 10, 1960

In the Matter of the Estate of
GERTRUDE O. QUENVILLE, Deceased
WEISENSEE et al *v.* HOYT et al

347 P. 2d 609
348 P. 2d 1090

*Clarence A. Potts,* Portland, argued the cause for appellants.  On the brief were Potts & Davidson, Portland.

*Ferris F. Boothe* and *Lamar Tooze,* Portland, argued the cause for respondents.  With them on the brief was Black, Kendall & Tremaine.

Before McAllister, Chief Justice, and Rossman, Sloan and King, Justices.

SLOAN, J.

This is a will contest.  The contestants, Lloyd R. and George A. Weisensee were brothers of the de-

ceased testatrix, Gertrude O. Quenville. The proponent was James O. Hoyt, the executor and principal legatee of the challenged will. The other named parties are nominal parties only and have had no participation, as litigants, in this proceeding. The trial court, without specific findings, held the will to be the product of undue influence upon the part of proponent and set it aside; proponent appeals.

It will facilitate an understanding of the facts to refer to the deceased as Gertrude, to the contesting brothers as Lloyd and George and to the proponent as Hoyt. Other persons having a part in the various activities of these participants will be named in order of their appearance. The events that were particularly pertinent to the case and the conduct of the persons involved started about 1935 and ended with Gertrude's death in 1955. To tell the complete story, however, it will be necessary to begin many years before. During the most crucial years just mentioned it will be necessary to deviate from a chronological narrative. We will endeavor to provide an understandable perspective of the many interlocking events and dates.

Sometime about 1902 George Weisensee, the father of George, Lloyd and Gertrude, started a small transfer or drayage business in Portland. The original equipment apparently consisted of a dray and two horses. The business was organized as a corporation bearing the name Package Delivery Company. The business of this company expanded with the growth of Portland. Gertrude was born in 1902, George in 1899 and Lloyd in 1910. As the children reached suitable age they helped their father in the operation of the business. Beginning in 1917 Gertrude became the fulltime bookkeeper for the company and appar-

ently its dispatcher. The father died in 1928. At the time of the father's death Gertrude was the owner of seven shares of stock in the company and her mother became the owner of the remaining 93 shares of the company's authorized stock. Gertrude became the active boss and manager of the company. Lloyd, the youngest one of the family, entered the business about 1929 or 1930. They were able to survive the depression years and in about 1936 bought out a larger and competing company, Baggage & Omnibus Transfer Company. This name was thereafter used in the operation of the business.

There is some conflict of testimony in regard to how the business was managed after 1936 until about 1943. Lloyd and George both testified that it was a family affair and the operation was jointly managed by the three of them. The more convincing testimony of customers and employees would establish that Gertrude was the boss and brooked little opposition to her decisions. She was a unique character. She was a large woman weighing as much as 220 pounds, more masculine than feminine in appearance and action. She could and did perform any of the work of loading and driving a truck, did practically all of the dispatching and ruled the employees with a firm hand. She could work, swear, drink and apparently, if the occasion demanded, fight as well as most men. However, she was also described as possessing an appealing and delightful personality. One customer of long-standing testified that she was so interesting and compelling of personality that one shortly forgot her appearance and became mindful only of the attractiveness of her traits of character and intellect. She was also described as possessing exceptional business acumen. This is the person whose subsequent in-

firmity and alleged subjection to evil influence we are called upon to judge.

Sometime prior to 1939 she was married to one Milford Quenville. Little is shown of this marriage. We do know that no children resulted from it. Quenville will be mentioned later. We mention that Gertrude was married prior to 1939. That is the year in which the proponent, Hoyt, became the other principal actor in the events culminating in this contest. During 1939, and for some years prior, Hoyt was one of the owners of a garage and automobile service business known as Ankeny Auto Service. The trucks owned by the transfer company were taken to Hoyt's place of business for service and storage. By this means Hoyt and Gertrude became acquainted. Beginning in 1939 this acquaintance ripened into a social one. By 1940 or 1941 it became a very intimate relationship. Nearly all of their nonworking time was spent together, including weekends at a farm owned by Gertrude.

As stated, Gertrude was married when this course of conduct started. So was Hoyt. He was married and the father of two children. When the intimacy started Gertrude was about 38 years old. Hoyt was five years her junior. He was not as physically large as she was. He testified that he was attracted by her personality and intellectual stimulation as well as by physical stimulation. Gertrude was divorced by her husband in 1942. Until 1943 Gertrude lived with her mother, Anna Weisensee, in the family home. We are not informed as to the whereabouts of her husband. Hoyt was a frequent visitor. In that year her mother died. The death of Anna Weisensee caused a change in the status of all of the parties here involved. However, in order to complete the picture to

that date, 1943, we turn briefly to the relationship between Hoyt and his wife.

Prior to her death Anna Weisensee became dissatisfied with the state of affairs between Gertrude and Hoyt. If Mrs. Weisensee, or anyone, attempted to remonstrate with Gertrude, the latter let it be known that she was in love with Hoyt and regardless of circumstances intended to keep him if she could. As a result Anna Weisensee talked with Hoyt's wife, Olive, and told her what was taking place. This was in late 1942. Mrs. Hoyt testified for the contestants, Lloyd and George. When asked what she did following the receipt of this information she testified that she "mentioned" it to Hoyt. He then asked her for a divorce which she refused. She testified that "I told him that he had a duty to his children, and I knew that he had enjoyed privileges after, and he was to give his children the same privileges." This testimony was not explained or elaborated. She did testify that the subject was never mentioned again but from about that time forward the two of them occupied separate bedrooms. After the death of Gertrude's mother, Hoyt moved some of his clothes into Gertrude's home. For the next twelve or thirteen years, until Gertrude's death in 1955, he spent every evening in Gertrude's home. He would return to his own home late in the evening and there spend the night. Every weekend Gertrude and Hoyt spent together, either at her farm or at a beach home they later acquired.

The activities of Hoyt and Gertrude were not limited to social or amorous affairs. Each of them found delight as well as profit in the affairs of business. In 1941 they started a long series of mutual investment. They began by buying used cars and picked a propitious time to do so. By 1944 they were

engaged in the purchase and sale of other personal and real property. So much so that in 1944 they entered into a written partnership agreement prepared for them by their attorney, Mr. Winfree. This agreement required each to invest $10,000 in the partnership business and provided for an even division of profits. There followed a successful course of investment, largely in industrial property, some of it in substantial amount. In a few instances they would acquire an industrial site and build a building thereon for leasing to a prearranged lessee.

The evidence presented on the subject of this partnership business would indicate that the two of them mutually participated in its many transactions; that decisions made were frequently the result of heated and extended discussion and consideration. There is no evidence that either was a dominant partner. They enjoyed profit as a result of this endeavor.

In 1953 all of the partnership assets and other individually owned property was transferred by each of them to a corporation that had been formed and in which they were also equal owners. We will refer to this transaction later. Bear in mind, now, that between 1940 and 1955 the inherent relationship between these two people did not change. It was immoral and improper, but it existed. They apparently shared every aspect of their life together except for the nocturnal return of Hoyt to his own home.

At this point we must return to the relationship between Gertrude and her brothers. Until 1943 Gertrude continued as the dominating drive in the transfer and warehouse business owned by the three of them. As already mentioned, there was no part of this growing business that she could not perform. After the start of World War II with the shortage of man-

power she was called upon to perform many tasks usually done by a man. The testimony of contestants' witness, Miss Nadine Frank, a woman who had worked as a cashier for the business beginning in 1936 and continuing for all of the years in question, provides the best short description of Gertrude given by any of the witnesses. She testified:

"Q What type of language did Gertrude O Quenville use in the course of her business?

"A Well, in the transfer business, there was some pretty rough talking going on, and of course she was like that,—very forceful in her language, very lusty and dominating, I think would be the word for her, over the people that she worked with, but not me, she never was.

"Q She treated you with respect?

"A Very, very fine always.

"Q And over the years, did you develop a friendship with Gertrude O Quenville?

"A Yes.

"Q And how would you characterize that friendship?

"A There was both social and business; I never went out with her socially, but we enjoyed a very fine friendship in the office; never did we ever have any trouble.

       \*    \*    \*    \*    \*

"Q Did you observe the health of Gertrude O Quenville between 1936 and 1941?

"A Well, of course, until she had this first stroke, she had a wonderful physique,—she was big and husky; for instance, when we had the labor war down there, when we had door deliveries, these men would get in the way and she would push them out,—take them in one hand and push them out into the street; she wasn't afraid of anything.

"Q Was she strong-minded?

"A Very much strong-minded, and there wasn't anyone told her what to do about anything: she told them."

In late 1942 or early 1943 Gertrude suffered the first of a number of strokes that were to afflict her for the remainder of her life. The 1943 stroke left residual numbness in her left hand and wrist, caused some impairment of the use of her left leg and impairment of her speech. After that her activity in the transfer business lessened. The brother Lloyd testified that he was required to perform more of the duties of management and that it was necessary to rely on other employees to dispatch. In 1948 she went to a medical clinic in Woodland, California. As a result of medical findings and recommendations made by the doctors of that clinic Gertrude substantially terminated her work at the transfer business and thereafter remained, for the most part, in her home. It appears that she could drive a car until sometime in 1950. Thereafter she was largely dependent upon Hoyt, or others, to take her wherever she went.

Her condition remained substantially unchanged from 1950 until sometime after the will was executed on April 28, 1953. Lloyd and George presented evidence to show that her physical and mental condition did materially degenerate during the years last mentioned. The most believable evidence by both lay and medical witnesses was to the contrary. She was able to move about by receiving support from a chair, person or by similar means. She was able to speak only a few words and those with difficulty. She made herself understood by gestures, answers to questions, facial expressions and by writing. Her will and determination appear to have been little affected.

When Anna Weisensee, the mother of Gertrude, Lloyd and George, died in 1943 she was the owner of 93 of the 100 shares of stock representing the total ownership of the transfer company. Gertrude owned the remaining seven shares. After the mother's death the 93 shares were divided equally between the three children. This continued until 1944 when George sold his 31 shares to Lloyd and Gertrude. At that time Gertrude wanted to buy all of George's stock but George refused to sell except to both Lloyd and Gertrude. In completing this transaction it was so arranged that thereafter Gertrude and Lloyd were each the holders of an equal number of shares. George left the business at that time and had no further participation in it.

After Gertrude's health required her to quit active participation in 1948 Lloyd continued in direct management of the business. Gertrude continued to draw a salary of $1000 a month until some time in 1950 when that salary was terminated for a period of about 14 or 15 months. Following that interval without compensation Gertrude was paid $300 a month until about January 2, 1953, when the payment was reduced to $100 per month. It is not disclosed for sure how long this latter payment continued. During this time Lloyd visited Gertrude at her home frequently, probably two or three times a week. She maintained an alert interest in the business and Lloyd advised and consulted with her about its operation. Many of these visits were social. Lloyd and his wife, Gertrude and Hoyt appear to have spent a great deal of time together on a social basis. Lloyd testified that he accompanied Gertrude and Hoyt to the beach home the latter two had acquired "a dozen times or more." Presumably his wife did too. Hoyt and Lloyd went

fishing together. Earlier, in about 1942 or 1943, Lloyd testified that he had had some discussion with Hoyt about the latter's relationship with Gertrude. It is not indicated that it was particularly discussed between any of these parties again. Until the dispute we are about to relate occurred, the status of the parties was accepted, or at least overlooked, and Gertrude and Hoyt engaged in continual social intercourse with Lloyd and his wife. The relationship between Gertrude and her brother George and his family appears never to have been as complete as with Lloyd. Gertrude appears to have had little tolerance for George.

Naturally, Gertrude was unhappy when her salary was cut off in 1950. The reason given to her by Lloyd was that it was necessary for the company to buy new equipment. Lloyd took a cut in his pay and cut Gertrude off entirely. She thought it unnecessary to buy the new equipment but Lloyd had his way. This friction over the operation of the company business continued. The equal ownership of the stock permitted neither of them to control the company. As a result, each of the participants wanted to buy the stock of the other but no satisfactory solution was found. For several years prior to 1951 the attorney for the transfer business had been Mr. A. B. Winfree. When the friction between Lloyd and Gertrude developed in 1951 Winfree informed both of them he could no longer represent either of them. Gertrude obtained the legal services of Walter Evans, Jr. and Lloyd engaged William B. Adams. Thereafter, most of the business dealings between the two were conducted by the two attorneys without any success in getting the parties to an agreement.

In the meantime, however, the social life between Lloyd and his wife and Gertrude and Hoyt appeared

to continue about the same. Mrs. Lloyd Weisensee and her children frequently called on Gertrude during the daytime; as did Lloyd. Both Lloyd and his wife would visit during the evening hours. Sometimes there would be drinking by some or all of them.

Also, in the meantime, that is between 1948 and 1953, the business we have previously described as conducted by Hoyt and Gertrude was continuing. In fact, it appears from the evidence that during a part of this time Gertrude's sole income was derived from that partnership. Prior to the time that Gertrude retained the services of Mr. Evans he had performed some legal services for Hoyt. After Mr. Evans became the attorney for the Hoyt-Gertrude partnership in 1951 he also became the secretary for the corporation we have previously mentioned, utilized by them to own some, and eventually all, of their property. Evans was, therefore, in frequent attendance at business conferences between Hoyt and Gertrude and also advised with Gertrude in her dealings with her brother Lloyd. All through the year 1952 Evans and Adams attempted to reconcile the differences of their respective clients to a buy and sell agreement of their respective shares of stock. They were unsuccessful. It was already stated that in January, 1953, Lloyd reduced the compensation Gertrude was receiving from the transfer company from $300 per month to $100. This was announced to Gertrude by a letter written to her by Lloyd on January 21, 1953. The reason Lloyd assigned for this cut was that the company had lost money in the year 1952.

On March 17, 1953, Mr. Adams, as Lloyd's attorney, addressed a letter to Evans setting forth a basis upon which Lloyd would enter into a buy and sell agreement with Gertrude. At about the same date,

however, both Lloyd and George executed the document that becomes the most crucial one of all the many writings involved in this case. They signed and filed a petition in the probate department of the circuit court for Multnomah county alleging Gertrude was incompetent and praying for the appointment of George Weisensee as her guardian. They immediately caused citation to issue and be served upon Gertrude. When she received this document the evidence is undisputed that she was shocked and deeply hurt. Later she became very angry at her brothers. It is doubtful that this anger ever subsided. For her brothers to accuse her of being incompetent was bad enough. But it can be inferred that to suggest her brother George should be put in charge of her affairs would have been a crowning blow.

The hearing on this petition was first set for March 24, 1953, but that date was later changed to April 29, 1953. The latter date becomes important. About a week after the service of this citation upon her Gertrude informed Mr. Evans that she desired to change her will.

The will Gertrude desired to change was one executed after she returned from the Woodland Clinic in 1948. The will had been prepared by Mr. Winfree. The 1948 will made specific bequests to Hoyt of her half interest in a commercial fishing boat owned by the two of them and her property at the beach. The residue of her estate was devised to Hoyt in trust for a period of twenty years. For the duration of the trust Hoyt, as trustee, was given power to manage and control her property. He was to receive, as a beneficiary, one-half of the income from the trust estate. Out of the remaining income he was first, at his discretion, to provide any sums necessary for

the care and maintenance of Gertrude's former husband, Milford Quenville. The remainder of the income, and the entire corpus at the termination of the trust, was to be divided equally between five nieces and nephews, the children of Lloyd, and one grand-nephew, a grandchild of George. The latter's only son had been killed in the war.

It may clarify the issues to be considered to now set out the terms of the challenged will. It was executed in the evening of April 28, 1953, the day before the hearing on the guardianship petition. The will made a specific bequest of $1000 to Milford Quenville. It devised certain real property to the Portland Trust Bank to be held by it in trust for her two brothers Lloyd and George for a period of 20 years, and thereafter to them or their heirs absolutely. The residue of her estate she devised to Hoyt. It is the provision for Hoyt made by the 1953 will and its method of execution that provides the basis for this contest.

When Gertrude called upon Mr. Evans to make a will he knew, of course, that her competency was then in dispute by the guardianship proceedings. Before proceeding at all he exercised the precaution of causing her to be examined by three different doctors: a neurologist, a pychiatrist and a heart specialist who had previously attended Gertrude. After the doctors had examined Gertrude and reported that they found her to be mentally alert Evans discussed the terms of the proposed will with her. He prepared a draft of the will, took it to her home and discussed this again. Evans preferred to have the will executed prior to the hearing on the guardianship proceeding set for April 29, 1953. Consequently, he prepared a final draft in accordance with her wishes and went

to her home on the evening of April 28, 1953. It is possible that there was an additional preliminary conference. Evans testified that he may have consulted with her after the second proposed draft. He took with him as witnesses a junior law partner and a court reporter. The reporter was there both as a witness and to record the execution of the will. This was done and was in evidence.

The reporter's transcript disclosed that the will as drafted did not suit Gertrude in certain particulars so that some changes were required to be made in the typewritten document by interlineation. During the course of these changes it was necessary for Evans to measure certain distances concerning property adjacent to Gertrude's home which she was devising to her brothers. He was then required to consult Gertrude about her wishes in this respect. The reported conversation is enlightening as it reflects Gertrude's knowledge of her property and the positive expression of how she wanted to dispose of it. The will was executed in proper form. Evans kept the original. Hoyt was not present during any of Evans' discussion with Gertrude as to the will, nor at the execution. Hoyt did know that she was engaged in drafting a will. The only evidence of any participation therein on his part is that he suggested she make provision for her brothers which she apparently had originally not intended to do.

At the guardianship hearing the next day the court did not find Gertrude incompetent and refused to appoint a guardian. At Gertrude's request the court did appoint a conservator, the Portland Trust Bank. There is no evidence that the conservatorship was necessitated by any mental inability of Gertrude to handle her affairs. The evidence would indicate it

was largely because of her physical impairment. It can also be inferred that the conservatorship was an added precaution of a careful attorney. This can be demonstrated by the fact that immediately after the bank was appointed conservator Evans requested its responsible officers to examine and pass judgment upon certain business transactions of a substantial character that Hoyt and Gertrude had engaged in prior to the conservatorship. This was with the understanding that if the bank in its independent judgment thought that a particular transfer of property between Hoyt, Gertrude and the corporation was not to her best interest, the transaction would be rescinded and avoided.

The bank did investigate and concluded the transactions were for Gertrude's benefit. This tended to eliminate the argument that Hoyt had taken advantage of Gertrude, and that she had not been able to act in her own behalf. The record discloses that thereafter the bank participated in various transactions in which Gertrude was involved but that the ultimate decisions were hers.

Otherwise, the evidence of Gertrude's condition after the date of the will until her death is scanty. It is provided for the most part by incidental testimony of witnesses who had been long time friends of Gertrude and Hoyt and who continued to visit with them at the beach and other places until shortly before Gertrude died.

■ The foregoing statement of facts, long as it is, is actually little more than a skeletal outline of the long record. We have not attempted to detail the evidence as to many transactions and events utilized by one side or the other to support their case. With respect to the issue of Gertrude's competence to make

a will there can be no doubt. The testimony of the doctors, of disinterested witnesses and the witnesses to the will is most convincing that Gertrude possessed all of the requirements of testamentary capacity. Her physical activity was impaired, and she was subject to emotional upset, but that is all that can be said. It is now necessary to consider the further charge of undue influence on the part of Hoyt.

■ Before we consider the specific evidence on this issue it is necessary to consider which party bore the burden of proof. There is no doubt that a confidential relationship existed between Gertrude and Hoyt. However, as we have already seen, and from the evidence to be mentioned, it appears that the relationship was not "such as to indicate a position of dominance by the one in whom confidence is reposed over the other." *Doneen v. Craven, Executor et al*, 204 Or 512, 522, 284 P2d 758. And, as indicated, there is no evidence that Hoyt had any actual participation in the preparation and execution of the will. *In re Estate of Meier,* 190 Or 140, 224 P2d 572. In the trial court the contestants, Lloyd and George, acknowledged that they bore the burden of proving undue influence. In that we think they were correct.

■ It seems expeditious to take up the arguments advanced by Lloyd and George and consider the evidence in respect thereto. There is little disagreement as to law to be applied.

In substance, the brothers contestant contend that until Hoyt became involved with Gertrude in 1939 the family was a unit without argument or dissention. They say that from 1940 or thereabouts until the date of the execution of the contested will in 1953 Hoyt proceeded with malicious and calculated design to

sever Gertrude's relationship with the other members of the family and that he interfered with the operation of the family transfer business to gain that end; that he utilized Gertrude as a means of feathering his own nest at her cost; that he was possessed of an evil, fraudulent purpose during all of that time to gain his own ends; that he was possessed of no real love and affection for Gertrude but was motivated by greed. Specifically, the brief submitted by Lloyd and George contains statements of this nature:

"* * * The brothers and sister had enjoyed a close and congenial family life until the intrusion of James G. Hoyt into the family. (Tr. 435). This intrusion led to the withdrawal of George from the Baggage & Omnibus Transfer Company in 1944, and the creation of numerous misunderstandings between Lloyd and Gertrude culminating with the execution of the will of April 28, 1953."

". . . that his [Hoyt's] insatiable greed was the dominating influence in his relationship with Gertrude."

"The attitude of Hoyt throughout this entire period is not consistent with any other motive than simply extra-marital sexual intercouse at an early date (1939-1940) and thence, after Gertrude's illness, the desire for financial gain."

It is said the will makes an unnatural disposition of Gertrude's property.

What has already been said should indicate that Hoyt did not interfere with the family life of the Weisensee family. The evidence to support the contention of such interference is almost entirely of this character: When Lloyd was a witness the following was typical of his testimony:

"Q Could you observe any interference by Mr.

Hoyt in the business of the Baggage & Omnibus Transfer Company during this time? [1943-1948]

"A Well, yes, he did; he injected himself quite frequently into the company business.

"Q Would you describe a particular instance of this type of interference?

"A Well, in some of her decisions; I mean, I was trying to run the company one way, and she would suggest other things, I knew it wasn't her ideas.

"Q Would you sometimes discuss matters with her?

"A Yes, and in some matters he would—Mr. Hoyt would directly object.

"Q So you finally had no agreement at all with her?

"A Yes, that's right."

There was no evidence as to time or place or in what particular the claimed interference occurred. In fact, about the only concrete evidence of any precise conversation involved an event that happened several years later in early 1953. Lloyd had submitted to Gertrude a financial statement for the operation of the business for the year ending December 31, 1952. The profit and loss statement, in evidence, disclosed the company operated at a loss for that year. Mrs. Lloyd Weisensee testified that during one of the social evenings spent together by the four of them Hoyt said to Lloyd that Gertrude did not understand the profit and loss statement and would he explain it to her. This was when speech was very difficult for Gertrude. There is nothing in this inquiry to indicate an interference with the business. In fact, it occurred after Lloyd had cut Gertrude's compensation from $300 to $100 per month as a result of the claimed financial loss in the company operations.

On the other hand, other testimony of Lloyd is significant as to the more likely cause of the rupture between Lloyd and Gertrude in the conduct of their business. In 1944, when the latter was still active in the business and responsible for dispatching trucks and merchandise, she had the assistance of an employee named Allen Mann to help her perform the duties. At that time Lloyd's duties were performed at a location away from the warehouse and office where Gertrude worked. When Lloyd was attempting to emphasize his sister's mental and physical deterioration in 1944 he testified:

"* * * We had a few incidents where my sister had told Allen to do certain things, and Allen had done them, and I had already told Allen not to do them, and so Allen, of course, got caught between two fires; so I got Allen to one side, and I told Allen, 'If my sister tells you to do something, you call me up, and let me make the decisions', because I felt that my sister's decisions were not to the best interest of the company any more."

Later he testified: "I operated the transfer company at that time through Allen Mann."

It can thus be seen that as early as 1944 when Gertrude was still active in the business Lloyd was countermanding her orders to employees involving day-to-day operations in which there was and could have been no claim that Hoyt was a participant. It requires no imagination to know what the effect of this conduct, done behind Gertrude's back and without consulting her, would have upon the strongminded person we have described. It appears, therefore, that the evidence would support an inference that Lloyd's attempt to grasp the reins of management without Ger-

trude's knowledge could have been more of a cause of difference than any participation by Hoyt.

The testimony of one of the disinterested witnesses is also pertinent to this issue. This was a witness called by contestants. She and her husband had been social friends of Gertrude and Hoyt. They were among the many weekend visitors at the beach place. They were also well-acquainted with Lloyd. The witness was asked if she had ever heard Hoyt say anything unkind about either Lloyd or George in Gertrude's presence during the several years of their acquaintance. Her answer was "No."

Mrs. Lloyd Weisensee testified that she was a frequent visitor in Gertrude's home, by herself or with her children in the afternoon, or with her husband in the evening. Gertrude, and presumably Hoyt, spent Christmas, birthdays and other occasions at the home of Lloyd and his wife. The latter visited with Hoyt and Gertrude at the beach. We cannot specify the exact years during which this social life continued. The evidence is indefinite. It certainly existed from 1943 until January 21, 1953. Thereafter we do not know. The evidence does show that Mrs. Lloyd Weisensee continued her afternoon visits through the guardianship proceedings, and afterwards. Mrs. Weisensee asserted that a day or two after the guardianship proceedings were filed she called on Gertrude and explained to Gertrude that they were acting for her best interests in filing the petition. She testified that Gertrude "had been upset, but she calmed down." Thereafter, Mrs. Weisensee continued "seeing her just as often as I could; I went in the afternoons." This testimony is mentioned as it casts light on the charge of interference in the family relationship. It also reflects that Hoyt did not prevent, or attempt at any

time to prevent, members of the family or anyone from calling on Gertrude at any time they chose.

There is no evidence to support the charge that Hoyt caused George to withdraw from the company in 1944. The only evidence on this subject is George's testimony that "I just couldn't take the strain any more." An attempt was made to show that Hoyt had accused George of stealing merchandise from the warehouse. The evidence disclosed that Lloyd was the one who made the accusation. We are actually left to speculate on this question. It does not appear that either Lloyd or Gertrude forced George from the company. The only evidence is that he quit and the other two bought his stock.

The evidence is equally lacking that Hoyt used Gertrude's credit and wealth to improve his own financial situation. In 1941, when Hoyt and Gertrude first started their mutual ventures, there is no showing that Gertrude had either credit or wealth. The only precise evidence before us as to the financial rewards Gertrude enjoyed from the partnership business with Hoyt in contrast to the transfer business she shared with Lloyd is a copy of her income tax return for the year 1951. That disclosed that she received income for that year from the transfer company in the amount of $2500. She had income for the same year from the partnership of $11,146.64. An attempt was made to explain that this income was solely as the result of the sale of certain property. If so, it is not understood why it would have been reported as income rather than as the proceeds of the sale of property. The contention is like many others advanced by the contestants, based more on bald assertion and argument than on evidence. The evidence supports the belief that the partnership was

successful and the property thereby accumulated formed or helped create a substantial part of her estate.

It is claimed this was an unnatural disposition of Gertrude's property. This court has held that: "If one examining the record should conclude that it was 'an unnatural will', that would be a fact relevant to the issue of undue influence. It would not determine the issue because, of course, the testator had the legal right to dispose of his property as he saw fit." *Doneen v. Craven, Executor et al,* supra, 204 Or 524. In this case we cannot say that the will was unnatural from the point of view of the testatrix, Gertrude. She had more reason to feel a testatmentary affection for Hoyt than for anyone else. There is stronger reason to believe that the ill-advised petition to have her declared incompetent was more the cause of minimizing her gifts to her brothers and their families than anything that Hoyt had to do with the will.

The brothers testified that their only purpose in filing the petition for guardianship was to enable them to provide better housekeeping help for Gertrude. They contended that Hoyt had refused to get additional help because he wanted Gertrude to be completely dependent upon him. Gertrude did have a woman who came each morning and stayed until noon. She performed the various household chores of cleaning, clothes-washing and some personal care of Gertrude. This appears to be all of the help Gertrude wanted.

The other evidence was that all of the persons involved with the woman, Lloyd, his wife; George, his wife, Hoyt and others, asked Gertrude to get additional help. She adamantly refused. Mrs. Weisensee testified that she on one occasion asked Gertrude to get more help. Gertrude's response was to shake her fist.

Other testimony showed that such a gesture was one of strong disapproval. In other words, the only testimony in the record is that Gertrude refused additional help. Hoyt had nothing to do with it. The brothers did not explain as to how they expected brother George, as guardian, to force Gertrude to accept more help. A possible explanation, and not without evidence to support it, of the attempted guardianship is that Lloyd thought it might assist him in settling his affairs with Gertrude to have George in control of her property as guardian.

Even if it could be found that Hoyt was influencing Gertrude in this bargaining between Lloyd and Gertrude there is no evidence to show that any such influence was contrary to Gertrude's best interests.

We have already over extended the length of this opinion. Much of the evidence we have not mentioned. There were pages of repetitious testimony as to the decline of Gertrude's mental and physical health. The sum of a lot of the testimony reveals that Gertrude received, and for the most part, much enjoyed the visits and companionship of many people. And, even with her extreme difficulty of communication, the visitors and friends continued to enjoy her company. There is the testimony, amongst others, of three particular businessmen, each of whom held important positions as managers or owners of large business concerns in Portland, who frequently visited with Gertrude and Hoyt as weekend guests at the beach home. This continued almost to the time of her death. From none of these do we glean that her physical and speech impediments materially altered her mental alertness and personality. Nor does the testimony of any of the disinterested witnesses disclose any dominion or rapacity of Hoyt over Gertrude.

From the evidence just mentioned we take another important consideration: This was not a case like *In re Kelly's Estate,* 150 Or 598, 46 P2d 84, and many others that could be cited, where the conduct of the alleged influencer isolated the testator from other people or where the principal acts of influencing were committed in a bedroom or similar confined place. The relationship between Gertrude and Hoyt, although admittedly improper and unlawful, was open and notorious. Not only did Hoyt not attempt to restrict her visitors or friends, the evidence would indicate that he invited and welcomed them. Gertrude's contact with the members of her family has already been examined at length.

■ We have measured the conduct of Hoyt against the specific criteria set forth in *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886, and many of the cases cited therein; also, 1 Jaureguy & Love, Oregon Probate Law and Practice, § 319 et seq. We conclude that the only basis at all for finding undue influence is the impropriety of the relationship. That fact alone is not enough to establish the type of conduct denounced in the cases. *In re Kelly's Estate,* supra, 150 Or at 618. This court does not condone or approve the immoral climate in which this conduct had its inception. But neither can we assess the legal rights of persons on that ground alone. We find that the evidence does not warrant a finding that the influence of Hoyt was wicked, fraudulent or subversive for his selfish purposes. The evidence is much more conclusive that the influence to which Gertrude reacted was that of the affection, satisfaction and profit which she derived from her relationship with Hoyt. *Allen v. Breding,* 181 Or 332, 181 P2d 783.

We have not mentioned all of the evidence pre-

sented by the contesting brothers which they emphasized as showing undue influence. The failure to mention particular evidence or argument does not mean it has not been considered.

 "It appearing that the testa[trix] had testamentary competency, and there being no satisfactory evidence of undue influence, it is our duty to uphold the will." *In re Estate of Meier,* supra, 190 Or at 151. The decree is reversed and the will of April 28, 1953, admitted to probate. Neither party should be allowed costs in this court. However, the attorney's fees allowed contestants by the trial court must be disallowed. *State Land Board v. Sovenko et al,* 202 Or 571, 581, 277 P2d 781.

### ON PETITION FOR REHEARING

WILLIAM L. DICKSON, Judge.

Ferris F. Boothe, Lamar Tooze and Black, Kendall & Tremaine, Portland, for the petition.

Before McAllister, Chief Justice, and Rossman, Sloan and King, Justices.

SLOAN, J.

■ The vigorous petition for rehearing in this case presents one issue which probably requires notice: It is said that the burden of proving undue influence was "erroneously imposed" upon the contesting brothers of the deceased. The reference to the burden of proof in the original opinion can stand clarification.

The opinion stated: "There is no doubt that a confidential relationship existed between Gertrude and Hoyt. However, as we have already seen, and from the evidence to be mentioned, it appears that the relationship was not 'such as to indicate a position of dominance by the one in whom confidence is reposed over the other.' ", citing *Doneen v. Craven, Executor et al*, 204 Or 512, 522, 284 P2d 758. The opinion then proceeded to hold that contestants bore the burden of proof. The petition for rehearing contends that when a confidential relationship is established, that fact alone shifts the burden of proof to the proponent.

We have consistently held that a confidential relationship, in and of itself, does not place on the proponent of a will the burden of proving lack of undue influence. The cases touching the subject are discussed in 1 Jaureguy and Love, Oregon Probate Law and Practice, § 316, p 306, et seq.

Specific reference to some of these cases may help to eliminate any confusion resulting from the opinion in this case.

"The burden of proof of undue influence is ordinarily upon the party who asserts it and never shifts, but there may be circumstances when it is cast upon a beneficiary. Such is the rule when there is proof of the existence of a confidential relationship between the testator and the beneficiary, coupled with proof that the beneficiary actively participated in the will's preparation. Evident activity of that character casts upon the latter the burden of disproving undue influence. [Citing cases]" *In re Estate of Verd Hill,* 198 Or 307, 334, 256 P2d 735.

The above language was quoted in *In re Estate of Manillus Day,* 198 Or 518, 529, 257 P2d 609. The latter case was, in turn, quoted with approval in *Doneen v. Craven,* supra. In an earlier case, *In re Knutson's Will,* 149 Or 467, beginning at p 486, 41 P2d 793, Justice ROSSMAN reviewed many of the decisions of this court on the same subject as well as decisions from other courts. The latter cases may be summarized in a quotation utilized by Justice ROSSMAN taken from 66 ALR, p 228:

" 'It is the generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will.' " 149 Or at 487.

At 149 Or, p 488, the opinion in the Knutson case concludes:

"From the above it is clear, therefore, that no

presumption exists that the beneficiary exercised undue influence upon the testator, unless the evidence indicates that a confidential relationship existed between these two individuals, and that the beneficiary was actively concerned with the preparation of the will. * * *" See op cit at p 490, et seq.

The most recent expression by the court was by Justice O'CONNELL in *In re Reddaway's Estate,* 214 Or 410, p 420, where it was also held that the burden does not shift from the contestant unless there are other suspicious circumstances in addition to a relationship of confidence.

In this case we found the evidence did not establish that there was any activity, dominance or "insidious" conduct requiring the proponent to assume the burden of proof. In this particular case we would find the issue to be immaterial. The proponent met the burden if it should be said that he carried it. The evidence was convincing to this court that the will was not the product of the claimed machinations of the proponent. The court is not disposed to reconsider the result reached in this case. It appeared necessary, however, to call attention to the rule which this court has firmly adopted with reference to the burden of proof.

The petition is denied.