Argued April 21, affirmed June 10, 1971

In the Matter of the Estate of Georgie Lee Golden,
Deceased.

GOLDEN et al, *Appellants, v.*
STEPHAN et ux, *Respondents.*
485 P2d 1108

*Donald Winfree,* Portland, argued the cause and filed the briefs for appellants.

*Walter H. Evans, Jr.,* Portland, argued the cause for respondents. With him on the brief was William D. Peek, Portland.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

FOLEY, J.

This is a will contest. After trial a decree was entered denying contestants' petition to revoke the will and contestants appeal. A statement of the factual background is necessary to an understanding of the issues.

The decedent, Georgie Lee Golden, was a bachelor without close relatives. He was 69 years old at the time of his death and had lived by himself since the death of his mother in 1953. Mr. Golden's property had descended to him mostly from his mother who had been the second wife of his father, Frank Golden. Decedent had never worked but the property which he owned was sufficient to enable him to live comfortably.

The contestants are the nieces and nephews of Georgie Lee Golden and the grandchildren of Frank Golden and his first wife. The subject of the family property was a sensitive one and there was no contact over the years between the decedent and his nieces and nephews.

The decedent first became acquainted with Lawrence Stephan, one of the proponents of the will, in 1950. At that time Mr. Stephan, a neighbor, did some work for the decedent at the latter's home and as time passed a friendship developed between the two men. In 1966 the decedent entered the Powellhurst Nursing Home suffering from osteoporosis and herpes zoster (shingles), neither of which is a mental disease. With the exception of a short period of hospitalization in 1968, the decedent remained in the nursing home until his death in February of 1969. During this time Mr. Stephan assisted him by running errands and later by making bank deposits and paying bills for him. Mr.

Stephan was a frequent visitor to decedent in the nursing home.

In March of 1967, Mr. Mark Hathaway, a Portland attorney, was contacted by Richard Walruff, the manager and one of the owners of the nursing home. Walruff told Hathaway that one of the patients, Mr. Golden, wanted an attorney to draw a will for him. Attorney Hathaway went to the home, interviewed the decedent and prepared a will which the decedent later executed.[1] The will left the decedent's estate to Lawrence Stephan and his wife Verna. Two years later the decedent died and the will was admitted to probate. Thereafter the nieces and nephews of Mr. Golden filed a petition in contest alleging that the decedent lacked testamentary capacity and that undue influence had been exerted upon him by the beneficiaries. Trial was had before the court and a decree was entered denying contestants' petition and admitting to probate in solemn form the will of Georgie Lee Golden dated March 30, 1967.

Contestants contend that (1) the evidence at the trial was insufficient to prove testamentary capacity, and (2) the evidence established undue influence over the decedent by the proponents.

We will discuss first the question of testamentary capacity. The cases have frequently set forth the criteria for sufficient capacity to make a will.

> " 'The requirements of sound-mindedness or mental competency, as used in ORS 114.020, have been frequently stated by this court and may be

---

[1] The decedent had executed an earlier will in 1960 leaving his personal effects and a life estate in all his real property to a friend and the bulk of his estate to the Shriner's Hospital for Crippled Children. This will was prepared for decedent by Mr. Howard Arnest, a Portland attorney.

summarized as follows: (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will. * * *.' *Kastner v. Husband,* 231 Or 133, 136, 372 P2d 520 (1962)." *Martin v. U.S. National Bank,* 1 Or App 260, 263, 457 P2d 662 (1969), Sup Ct *review denied* (1970).

With regard to the burden of proof, the proponent of a will has the burden of proving the testamentary capacity of the testator although the proponent is aided by a presumption of competence which attends a properly executed will. *Ehry et al v. Blackford et al,* 228 Or 248, 364 P2d 626 (1961). Here the will was properly executed, so proponents are entitled at the outset to the presumption of competence.

Contestants assert that decedent was not able to understand the nature of the act in which he was engaged nor was he cognizant of the scope and reach of the provisions of the document. They cite *In re Shanks' Estate,* 168 Or 650, 126 P2d 504 (1942), wherein the court said:

"An important factor in determining the competency of the testator to execute a will is proof of his business ability * * *." 168 Or at 662.

It is true that the decedent was not an astute businessman. His former attorney, Mr. Howard Arnest, testified to his lack of business ability. Decedent had never had to work but he did transact business through Mr. Arnest and others. Mr. Arnest testified that he had

the decedent sign various papers during his repre-
sentation of him and "all down the years, he had de-
pended on me in my judgment."

Mr. Arnest testified as follows concerning Georgie
Lee Golden's mental competency prior to March 30,
1967:

"Q (By Mr. Welsh) Mr. Arnest, in connection
with your own dealings with Mr. Golden, what had
you observed so far as his independence of thought
and action in your dealings with him?

"A Lee Golden had no real business ability or
judgment. I would say, from way back in '66, wasn't
an alert, was a sluggish fellow. He was retiring. He
wouldn't go anywhere. He preferred to stay around
his home. When he would need something, he would
call me to come down, and I would go down and I
would write a check for him. He would sign them,
whatever, whenever, to pay his monthly bills. He
didn't pay any attention to what he signed. If I
told him to sign it, he signed it. He never asked
what it was, what it meant. He would just say,
'Shall I sign this?' And he signed it.

"Now, that was the type of man that he was
during late '66 and during all the many contacts I
had with him in '67. He did whatever I told him to
do, whether he did what other people told him to do,
I don't know. He did what I told him to do. He'd
never ask a question except what should he do.
"* * * * *

"Q At the time you saw him in March, would
he have been competent to execute a Will?

"A I don't think that I would have drawn a
Will for him if I would have been asked to because,
in my opinion, he wasn't capable of any business
transaction. * * *"

Mr. Arnest also testified that Mr. Walruff told him
Golden was incompetent when the will was signed.

In the summer following the execution of the

will the State Highway Department desired an option to go through certain property belonging to the decedent and, upon communication from the Highway Department, attorney Arnest went to see the decedent in the Powellhurst Nursing Home and had him execute an option which Mr. Arnest acknowledged in his capacity as a notary public. Mr. Arnest was asked about this on cross-examination and testified as follows:

"Q  Do you recall whether or not you were the Notary who acknowledged the option assigned by him on the occasion of your last visit out there in July, I think it was?
"A  The Highway option?

"Q  Yes.
"A  I must have been.

"Q  You were aware, of course, of what you were representing when you acknowledged that as his own free act and deed?
"A  Yes.

"Q  Do you find any inconsistencies between that act and your testimony here today that you have some reservations as to whether he knew what he was doing, or not?
"A  No, I don't.

"Q  Would you care to explain?
"A  Well, that is the way I felt. I wrote at the time I felt it was the best thing for the man to do. Why go through all the mechanics of having a guardian appointed, incur that expense, when in the end it would simply, the money would go to him anyway. While, technically, well, I still think it perfectly proper to take an acknowledgment under those circumstances and all the background and the long period of representation that I have had with this man. I know I said that I didn't think he understood. I told Mr. Stephan so, but, nevertheless, I thought that was the best thing for him. I still do.

"Q I didn't mean to imply any improper conduct. I mean, was it inconsistent to acknowledge that this was his own free act and deed and now take the position that he didn't know what he was doing?

"A Technically, yes."

In spite of his explanation, Mr. Arnest's having the decedent execute documents such as the option reflects somewhat upon his testimony that he thought the decedent was incompetent to make a will.

Mr. Hathaway, the attorney who prepared the will, did not agree with Mr. Arnest's evaluation. He testified that on his first visit with the testator after being contacted by Mr. Walruff of the nursing home decedent discussed his assets and liabilities with him in a knowledgeable way and decedent advised the attorney that he wanted his estate to go to Lawrence Stephan, "the only friend that he had." Mr. Hathaway testified that decedent appeared to understand his explanations regarding the powers of the executor. On the day following their conversation Mr. Hathaway returned with the will which the decedent read and then stated to be "exactly what he wanted and it was correct in all respects."

It is true that decedent was in poor physical condition during his stay at the nursing home and he did unusual things such as objecting to being bathed. Mrs. Gillander, the Director of Nursing Service at the home, testified some about decedent.

"Q (By Mr. Evans) What could you tell us as to whether or not he was oriented at that period of time [at the time the will was executed]?

"A Oh, he was oriented. He knew people.

"Q  Did he seem aware of what was going on about him?

"A  Yes, time and place and surroundings, all of this."

One of the subscribing witnesses to the will was Richard B. Walruff, the manager of the Powellhurst Nursing Home. Mr. Hathaway testified that Mr. Walruff was the one who had called him and asked him to come to see decedent about his will at decedent's request, and that he, Hathaway, had personally known Walruff for nearly 20 years and that Walruff was an old friend and client.[2] About Mr. Walruff's opinion as to the competency of decedent Mr. Hathaway testified:

"Q  [By Mr. Evans] I think I asked you if you talked to Mr. Walruff about his [decedent's] condition and you stated you had?

"A  Yes, I did.

"Q  What did Mr. Walruff tell you about his condition, do you recall?

"A  Yes, he said he was competent, nothing wrong with him. He said, 'He's sick, but there is nothing wrong with his mind.' "

The facts do not justify a claim that decedent did not know what he was doing or to whom he wanted his property to go.

Contestants urge that decedent did not know the nature and extent of his properties. They cite, for example, the fact that Mr. Hathaway did not recall any discussion with decedent about a piece of real property located in Eastern Oregon and worth approximately $27,000. This piece of property had in fact been sold to the decedent's uncle prior to the execution of the will and it is reasonable to assume

---

[2] Mr. Walruff died in June 1969, prior to the trial.

that the decedent thought of this asset in terms of the proceeds from the sale rather than in terms of the land itself. He specifically enumerated his bank accounts for Mr. Hathaway. Contestants also contend that the fact that Mr. Hathaway did not recall the decedent's giving him any values of assets was an indication that the decedent was in such poor mental condition that he did not know the value of his assets. Mr. Hathaway's testimony, however, does not suggest a decedent who did not know the nature and extent of his property:

> "And, then, I inquired of him as to what his assets were and he advised me that he had real property consisting of a residence at 6335 Southeast 92nd Avenue, Portland, Oregon, which was not rented at the time. He also advised me he had acreage at 93rd and Mt. Scott Blvd. in Portland, and a residence at 6424 Southeast 95th, which was rented, and he said he had some household goods, and my notation here shows no automobile. And, in addition, had some United States Series E Bonds. He had bank accounts in the First National Bank, Southwest Branch in Portland, the U.S. National Bank, the Eastport Branch in Portland, and a savings account at Pacific First Federal Savings & Loan Company here in Portland."

Contestants contend that decedent was not aware of the natural objects of his bounty. The principal basis of their contention is that the decedent did not advise Mr. Hathaway of the existence of five nieces and nephews. These five "next of kin" are the contestants. He did tell the attorney that he was not married and had no children and he gave the names and location of an aunt and uncle. The decedent had executed a prior will in 1960 and in that will he mentioned the side of his family to which the contestants

belonged and specifically excluded his half-brother, half-sister and "numerous nephews and nieces" from any share in his estate. While the contestants may have been the decedent's "next of kin" they were in no practical sense the "natural objects of his bounty."

■ Contestants' second assignment of error attacks the court's findings that there was no undue influence exerted upon decedent. There was evidence and the court found that Mr. Stephan was in a confidential relationship with the decedent. However, the burden of proving undue influence rests upon the contestant and the existence of a confidential relationship in and of itself does not place upon the proponent of a will the burden of proving lack of undue influence. It is, however, a circumstance which should alert the court and warn it to examine the record carefully. *Ehry et al v. Blackford et al,* supra; *Soumie v. McLean,* 234 Or 485, 382 P2d 1 (1963); *Weisensee et al v. Hoyt et al,* 220 Or 159, 347 P2d 609, 348 P2d 1090 (1959). There was no evidence that the Stephans played any part in the preparation or execution of the will. The Oregon Supreme Court in *Trombly et al v. McKenney, Ex., et al,* 191 Or 90, 228 P2d 417 (1951), held that a beneficiary's participation must be coupled with a confidential relationship before the burden of proving the absence of undue influence is placed upon the proponent. Neither was there any evidence of any activity, dominance or insidious conduct on behalf of either of the proponents. See *Weisensee et al v. Hoyt et al,* supra, 220 Or at 185. There was no evidence either direct or circumstantial in the entire record to show undue influence. Mr. Stephan and the decedent were friends. Stephan visited his friend often and assisted him in his affairs. Mr. Stephan's testimony is uncontradicted that he knew

nothing of the will until the decedent showed it to him after its execution.[9]

As the Supreme Court of Oregon said in the case of *McCaslin v. Mummery et al*, 222 Or 599, 352 P2d 1111 (1960):

"* * * [M]otive and opportunity to exercise undue influence upon a testator are not enough. There must be proof that undue influence was actually exercised and not only so, but that it was pushed to such an extent that the resultant will was not that of the testator but that of the parties procuring it. * * *" 222 Or at 602.

The circumstances surrounding the preparation and execution of the will lacked any reference whatever to Mr. Stephan. We agree with the trial court that the will was the free and rational exercise of the decedent's own testamentary desire and that decedent possessed the requisite testamentary capacity at the time of the execution of the will.

Affirmed.

---

[9] The deposition of Mr. Stephan was taken prior to trial by counsel for the contestants. Mr. Stephan apparently became testy and peevish and he gave a number of erroneous answers to questions put to him on the deposition. After the deposition a sheet of correct answers was transmitted to contestants' counsel and at the trial Mr. Stephan attempted to explain his incorrect answers when he said he "figured they [the questions] don't have no bearing on the case, so I didn't think it was too important." Mr. Stephan is a 75-year-old man and with an eighth grade education who has worked most of his life. Obviously he harbored some animosity for opposing counsel without any justification. It is not believed that his incorrect answers established anything more than his geriatric condition.